1

1          IN THE UNITED STATES DISTRICT COURT

2      FOR THE SOUTHERN DISTRICT OF MISSISSIPPI

3                SOUTHERN DIVISION

4        CIVIL ACTION NO. 1:15CV34HSO-JCG

5

6

7           JEFFERY CHAD PALMER, ET AL

8                    VERSUS

9      SUN COAST CONTRACTING SERVICES, LLC, ET AL

10

11

12

13          Deposition of JAMES R. MARTIN, JR.,

14   Ph.D., taken at KINNEY, ELLINGHAUSEN, RICHARD AND

15   DeSHAZO, 1250 Poydras Street, Suite 2450, New

16   Orleans, Louisiana 70113, on Monday, January 16,

17   2017, commencing at 11:17 a.m.

18

19

20

21

22

23

24

25



Exhibit 5



Page 2

```
 1                    INDEX
 2                                        Page
 3
 4    CAPTION................................1
 5    APPEARANCES...........................3
      AGREEMENT OF COUNSEL..................4
 6    REPORTER'S CERTIFICATE...............73
 7
 8                  EXAMINATION
 9    MR. NEGROTTO...........................5
10    MR. NOLETTO...........................67
      MR. NEGROTTO..........................70
11
12
                      EXHIBITS
13    #1....................................10
14    #2....................................10
      #3....................................29
15    #4....................................29
      #5....................................32
16    #6....................................32
      #7....................................44
17    #8....................................46
      #9....................................49
18    #10...................................53
      #11...................................54
19    #12...................................54
20
21
22
23
24
25
```

Page 3

```
 1    APPEARANCES:
 2              Negrotto & Associates, PLLC
              BY:  Lewie G. Negrotto, IV, Esquire
 3              133 Davis Avenue
              Suite L
 4              Pass Christian, Mississippi 39571
              (228) 222-4777
 5              skip@negrottolaw.com
                        -AND-
 6              Rafferty Law Group
              BY:  Donald J. Rafferty, Esquire
 7              2118 18th Street
              Gulfport, Mississippi 39501
 8              (228) 868-5421
              donaldrafferty@bellsouth.net
 9
              ATTORNEY FOR PLAINTIFFS
10
11              Butler Snow LLP
              BY:  Haley F. Gregory, Esquire
12              1020 Highland Colony Parkway
              Suite 1400
13              Ridgeland, Mississippi 39157
              (601) 948-5711
14              haley.gregory@butlersnow.com
15              ATTORNEYS FOR DRYING
              FACILITY ASSET HOLDINGS, LLC
16              AND SHALE SUPPORT SERVICES,
              LLC
17
18              Carr Allison
              BY:  Vincent A. Noletto, Jr., Esquire
19              6251 Monroe Street
              Suite 200
20              Daphne, Alabama 36526
              (251) 626-9340
21              vnoletto@carrallison.com
22              ATTORNEYS FOR LINFIELD,
              HUNTER & JUNIUS
23
      REPORTED BY:
24
              CINDY ROGERS LA COUR, CCR, RPR, RMR
25              Certified Court Reporter
```

Page 4

```
 1              S T I P U L A T I O N
 2
 3        IT IS STIPULATED AND AGREED by and
 4    between counsel for the parties hereto that the
 5    deposition of the aforementioned witness is hereby
 6    being taken under the Federal Rules of Civil
 7    Procedure, for all purposes, in accordance with
 8    law;
 9            That the formalities of reading and
10    signing are specifically not waived;
11            That the formalities of sealing,
12    certification and filing are specifically waived;
13            That all objections, save those as to
14    the form of the question and the responsiveness of
15    the answer, are hereby reserved until such time as
16    this deposition, or any part thereof, may be used
17    or sought to be used in evidence.
18                    * * * *
19        CINDY ROGERS LA COUR, C.M., Certified
20    Court Reporter, in and for the Parish of Orleans,
21    State of Louisiana, officiated in administering
22    the oath to the witness.
23
24
25
```

Page 5

```
 1        JAMES R. MARTIN, JR., Ph.D.,
 2    after having been first duly sworn by the
 3    above-mentioned Court Reporter, did testify as
 4    follows:
 5    EXAMINATION BY MR. NEGROTTO:
 6      Q.  If you would, sir, please state your
 7    full name.
 8      A.  James Robert Martin, Jr.
 9      Q.  And Mr. Martin, my name is Skip
10    Negrotto.  I represent the plaintiffs in this
11    case.
12            Obviously, we're gonna go through
13    a series of questions and answers.
14            Have you taken a deposition
15    before?
16      A.  No, sir.
17      Q.  Okay.  So that being the case, you've
18    never testified as an expert witness before
19    either?
20      A.  Correct.
21      Q.  Okay.  So I'm going to ask you a series
22    of questions.  I cannot tell you that all of my
23    questions will make sense because I am not a
24    hydrologist or an engineer, okay.  So if my
25    question does not make sense to you, please let me
```

Jeffery Chad Palmer, et al v.
Sun Coast Contracting Services, LLC, et al
James R. Martin, Jr., Ph.D.
January 16, 2017

Page 6

1 know, because I'm going to assume you understood
2 my question if you answer it.
3          If I don't speak clearly or for
4 some reason you don't feel like you can provide me
5 with an answer, please let me know.  If you need
6 to take a break at any time, don't hesitate.
7          I'd like for you to take a look at
8 Exhibit #1, which is the notice for your
9 deposition.
10 **A.  Yes, sir.  I just read the --**
11 **MR. NEGROTTO:**
12          We don't need -- we don't need
13 these.  We'll move these out of the way.
14 **MR. NOLETTO:**
15          Okay.  This is -- this is yours.
16 Those --
17 **THE WITNESS:**
18          Yes, sir.
19 **MR. NOLETTO:**
20          -- were exhibits to prior
21 depositions this morning, so that's yours.
22 **MR. NEGROTTO:**
23          Okay.
24 **EXAMINATION BY MR. NEGROTTO:**
25 Q.  If you would, look at the Schedule A

Page 7

1 that's attached to that.
2          Now, have you reviewed that before
3 today?
4 **A.  Yes, sir.**
5 Q.  Were you able to produce everything
6 that we asked for?
7 **A.  Yes, sir.**
8 Q.  Had you produced that prior to today?
9 **A.  Almost everything was produced prior to**
10 **today.**
11 Q.  This thumb drive that I have, does that
12 have everything on it that is a result --
13 **A.  Yes.  Yes, sir.**
14 Q.  -- of your production?
15 **A.  Yes, sir.**
16 Q.  Okay.  So these documents that you have
17 here that I was taking a look at, is all of this
18 information on that thumb drive?
19 **A.  Yes, sir.**
20 Q.  Okay.  Mr. Martin, are you taking any
21 medications today that would impair your ability
22 to answer the questions I'm asking you today?
23 **A.  No, sir.**
24 Q.  Are you taking any medicines at all?
25 **A.  No, sir.**

Page 8

1 Q.  Okay.  If during the course of this
2 questioning there is a document or an exhibit that
3 you need to help you explain your answer, please
4 let us know, and we'll make sure we get that for
5 you.
6          Now, you are here today as an
7 expert witness for Linfield, Hunter & Junius; is
8 that correct?
9 **A.  Yes, sir.**
10 Q.  And you're the company spokesperson on
11 certain topics, correct?
12 **A.  Yes.**
13 **MR. NOLETTO:**
14          He's here as an expert.
15          What company are you referring to?
16 He's not a 30(b)(6) deponent.  He's an
17 independently retained consultant here to testify
18 as an expert on behalf of.
19 **MR. NEGROTTO:**
20          On behalf of, but I'm getting
21 ready to find out exactly what topics.
22 **THE WITNESS:**
23          The company you mentioned, could
24 you clarify?
25 **EXAMINATION BY MR. NEGROTTO:**

Page 9

1 Q.  Linfield, Hunter & Junius?
2 **A.  No, I don't work for Linfield.**
3 Q.  But you're here on their behalf as
4 their expert?
5 **MR. NOLETTO:**
6          He's been retained to review
7 certain materials and testify based upon the
8 materials he has reviewed as relates to Linfield's
9 scope of work, I guess is the best way of putting
10 it.
11 **THE WITNESS:**
12          I misunderstood your question.
13 When you said "the company," I thought you meant
14 the company I worked for.
15 **EXAMINATION BY MR. NEGROTTO:**
16 Q.  No.  I meant the company you're here --
17 for whom you're giving expert testimony today.
18          Now, if you would, please, tell me
19 what your understanding is of the scope of the
20 work Linfield, Hunter & Junius was hired to do for
21 which you're gonna give an expert opinion?
22 **A.  The scope of work for which they were**
23 **hired for which I will be giving expert testimony**
24 **is that they were to design an internal drainage**
25 **system for the facility in question.**

Page 10

1　Q.　Okay.　Were you aware -- one second,
2　please.　Just give me one second.　I need to find
3　your report.　I know I have it.
4　　　　MR. RAFFERTY:
5　　　　　I got it right here.
6　　　　MR. NEGROTTO:
7　　　　　Let's go ahead and mark this as
8　Exhibit #1.
9　　　　THE COURT REPORTER:
10　　　　　Two.
11　　　　MR. NEGROTTO:
12　　　　　Two, I'm sorry.
13　EXAMINATION BY MR. NEGROTTO:
14　Q.　Now, you've just been handed what's
15　been marked as Exhibit #2 to your deposition,
16　Mr. Martin.
17　　　　What -- yeah.　This is -- at the
18　middle underneath the logo of Design Engineering
19　is dated June 9th; is that correct?
20　A.　Yes, sir.
21　Q.　These -- this is -- is this the final
22　opinion that you provided in this case?
23　A.　To the best of my recollection, yes,
24　sir.
25　Q.　Now, these pages are not numbered, but

Page 11

1　would you agree with me that it is six pages of
2　content, and then the last page is rates of
3　compensation?
4　A.　Yes, sir.
5　Q.　Okay.　Who is Design Engineering, Inc.?
6　A.　Design Engineering, Inc., is the
7　company for whom I am the president.
8　Q.　Okay.　Is this your company?
9　A.　In part.
10　Q.　Okay.　So there are other people who
11　either are employed by or own this company?
12　A.　Yes, sir.
13　Q.　Okay.　Are all of the opinions that you
14　intend to give in this case reflected in this
15　report?
16　A.　The conclusions are reflected in this
17　report.　I assume you may ask things that are in
18　greater detail, and those details may not be in
19　here.
20　Q.　Well, you're gonna give an opinion, and
21　the way I read this report, your opinion is that
22　the after-built storm water detention system meets
23　the prescribed output, for lack of a better term,
24　than what it was designed to do.
25　　　　In other words, it was designed to

Page 12

1　create a post-storm water runoff equal to or less
2　than pre-storm water runoff, correct?
3　A.　You contradicted yourself in the
4　statement.　You originally said as built, and then
5　you said as designed.
6　Q.　Okay.　So it's -- as designed is
7　different than as built?
8　A.　I don't know.　I don't know how it was
9　built.　I only know how it was designed.
10　Q.　Okay.　So you cannot testify today with
11　regard to how it was actually built?
12　A.　Correct.
13　Q.　Have you ever visited the site?
14　A.　Yes, sir.
15　Q.　Were you asked to provide or to do a
16　review of as-built conditions?
17　A.　No, sir.
18　Q.　Okay.　So your design is what you
19　based -- the design you were provided by Linfield
20　is the source of what you base your opinion on?
21　A.　Correct.
22　Q.　Okay.　Do you know if there's --
23　A.　With one exception.　I believe an
24　as-built drawing was provided of some things, and
25　that was included in the -- in the disclosure.

Page 13

1　Q.　Okay.　So as to as built versus as
2　designed, you don't know if it was built exactly
3　as designed?
4　A.　Correct.
5　Q.　Okay.　You said you did go to the
6　facility?
7　A.　Yes, sir.
8　Q.　When was that?
9　A.　Roughly April of last year.
10　Q.　How many times have you been to the
11　site?
12　A.　Only once.
13　Q.　Were you familiar with any of the --
14　how did you -- strike that.
15　　　　How did you come about being the
16　expert?　Were you contacted by Mr. Noletto?　Did
17　you have an affiliation with any of the companies
18　there?　How did you end up -- do you know?
19　A.　Prior to the site visit, at some point
20　early in 2016, one of the principals at Linfield
21　asked if I would be interested in providing expert
22　testimony.　I said it would depend on the
23　situation, the circumstances, and at that point,
24　Mr. Noletto began coordinating with me.
25　Q.　Had you had a relationship with -- I'm

---

Page 14

1  gonna just, for lack of a -- to make it easy, I'm
2  going to call it "LHJ," okay.
3              Had you had a relationship prior
4  to that initial conversation with LHJ?
5      **A.  Yes, sir.**
6      Q.  And what was your relationship?
7      **A.  We're competitors.**
8      Q.  You all are competitors?
9      **A.  Yes, sir.**
10     Q.  So you all bid on the same jobs?
11     **A.  Engineering services aren't bid, but we**
12  **do compete for the same work.**
13     Q.  Okay.  Have you ever worked together on
14  a project?
15     **A.  Not -- it's a complicated answer.  My**
16  **company, DEI, has worked with them on projects**
17  **prior to me becoming a member of DEI.  And I've**
18  **been in positions of supervision of their work,**
19  **and they've been in positions of supervision of my**
20  **work.**
21     Q.  Okay.  When was the last -- can you
22  give us some examples of when you were in
23  supervision of LHJ's work?
24     **A.  In 2010, I believe.  That's an**
25  **estimate.  I was performing duties as the City of**

Page 15

1  **Kenner's sewer program manager.  We had as many as**
2  **a dozen or more engineers performing design**
3  **services in our program.  Linfield was one of**
4  **them.**
5      Q.  Okay.
6      **A.  LH- -- LHJ was one of them.**
7      Q.  And is that the only time you can
8  recall?
9      **A.  Yes, sir, I believe that's the only**
10  **time I was in that position.**
11     Q.  And that was -- were you employed by
12  the City of Kenner, or City of Kenner hired DEI?
13     **A.  I wasn't at DEI at the time.  The City**
14  **of Kenner hired my previous employer for whom I**
15  **worked as a program manager.**
16     Q.  Okay.  Well, let's talk about that,
17  then.
18     **A.  Sure.**
19     Q.  For the last -- let's go backwards with
20  regard to your employers for the last ten years.
21     **A.  Okay.**
22     Q.  So who was -- prior to DEI, who were
23  you working for?
24     **A.  I worked for a company called "GEC"**
25  **from 2007 to 2011.  I'm sorry.  From 2007 to 2014,**

Page 16

1  **I worked for GEC, and that -- I guess that takes**
2  **us back ten years.**
3      Q.  All right.  Let's go back one more
4  employer.
5              Who was that?
6      **A.  My first employer was a company called**
7  **"BKI"; B as in boy, K as in kangaroo, and I as in**
8  **indigo.**
9      Q.  (Affirmative response.)
10     **A.  I worked for them since graduating**
11  **through 2007.**
12     Q.  And when did you graduate?
13     **A.  My final terminal degree was in '03.**
14  **But I worked for BKI intermittently during summers**
15  **and things of that nature.**
16     Q.  So you've been with DEI since 2014?
17     **A.  Yes, sir.**
18     Q.  You provided a résumé in regard to this
19  case.
20              Have you looked at that résumé
21  lately?
22     **A.  I updated it recently because I think**
23  **there were two things missing from the original**
24  **document that I supplied.**
25     Q.  Have you provided that to Mr. Noletto?

Page 17

1      **A.  It's -- I provided it to everyone**
2  **today.**
3          **MR. NOLETTO:**
4              It's part of what you got.
5          **THE WITNESS:**
6              This is -- if that's more than a
7  couple weeks old, this is definitely the most
8  current.
9      **EXAMINATION BY MR. NEGROTTO:**
10     Q.  This is several copies of the same
11  thing?
12     **A.  Yes, sir.**
13     Q.  Do you mind if we --
14     **A.  No, not at all.**
15         **MR. NOLETTO:**
16             No, go ahead.
17         **THE WITNESS:**
18             And they're on the thumb drive as
19  well.  The thumb drive has versions:  The old
20  version, the new version.
21         **MR. NOLETTO:**
22             This is just extra copies.
23     **EXAMINATION BY MR. NEGROTTO:**
24     Q.  Okay.  So this is the most recent
25  version, and as far as --

Page 18

1     A.   Thank you.
2     Q.   -- you're concerned, this has
3  everything on it?
4     A.   Yes, sir, to the best of my knowledge.
5     Q.   Okay.  You graduated from University of
6  Alabama.
7           That's how you know Mr. Noletto,
8  right?
9     MR. NOLETTO:
10          Believe it or not, no.
11    THE WITNESS:
12          That's oddly enough a coincidence.
13    MR. NOLETTO:
14          Off the record.
15          (Whereupon a discussion was held
16  off the record.)
17    MR. NEGROTTO:
18          Let's go back on the record.
19 EXAMINATION BY MR. NEGROTTO:
20    Q.   With regard to the report that you
21 have, have you been asked to perform any other
22 services other than what you've listed in this
23 report?
24    A.   No, sir.
25    Q.   Have you been given any additional

Page 19

1  information with regard to what was in this
2  report?
3     A.   Yes, sir.  Since that date, there have
4  been many additional disclosures made via all
5  parties.
6     Q.   Okay.  Do those -- do you intend to
7  amend or supplement your report based on the new
8  information you were given?
9     A.   No, sir.
10    Q.   Okay.  Have you ever been known by any
11 other names other than the one that you gave us
12 earlier today?
13    A.   No, sir, not legally.  Obviously there
14 are nicknames, but not legally.
15    Q.   Okay.  What is your Ph.D. in?
16    A.   My research was in open channel
17 hydraulics, multiphase flows.  My course work was
18 in hydraulics, hydrology, things of that nature.
19    Q.   Okay.  Have you ever been to any
20 technical schools prior to getting your Bachelor's
21 degree?
22    A.   Oh, no, sir.
23    Q.   But subsequent?
24    A.   Not -- I'm curious about the
25 definitions of a "technical school."  You'll see I

Page 20

1  have a certificate listed from Old Dominion
2  University as a -- it's not a Master's degree, but
3  it's a -- a certification.  I don't know -- in the
4  strictest sense of technical school, I don't think
5  so.
6     Q.   Okay.  Were you ever in the military?
7     A.   No, sir.
8     Q.   When was the last time you designed a
9  storm water drainage system?
10    A.   We're doing that all the time at our
11 company, so there's one going on right now in
12 which I'm intimately involved.  I -- for that type
13 of work, I'm involved in all the ones we do.
14    Q.   Okay.  And so you have one ongoing?
15    A.   More than one, yes, sir.
16    Q.   And can you tell us what -- where those
17 are?
18    A.   Sure.
19          Two -- two that immediately pop
20 out of my -- onto my head -- more than -- more
21 than two.  The simplest one would be -- to talk
22 about is Frisco Avenue drainage.  It's a part of
23 Old Metairie.  Parish of Jefferson has contracted
24 us to study the area to determine why a certain
25 area is flooding and to design improvements to

Page 21

1  alleviate the issue.  That one's going on right
2  now.  We just finished the survey last week.
3          Lakeshore Drive is a multiphase
4  project that we're performing design services on,
5  and part of the design is that we have to collect
6  the storm water and pass it through an 80-year-old
7  flood wall back out into Lake Pontchartrain.
8          Storm water systems are sometimes
9  involved in other projects.  They're -- we have
10 two very big drainage projects that move -- that
11 convey massive amounts of water through big
12 canals, and we have to collect storm water around
13 those as well.  So there's one of those on West
14 Esplanade Canal, and there's one of those on
15 Duncan Canal right now.
16          Those are the four that come
17 immediately to mind.
18    Q.   When was the last time that you
19 developed a storm water detention system similar
20 to the one at the sand plant?
21    A.   "Similar" is an open term.  But we --
22 we designed a storm water detention system for a
23 facility on the north shore within the last two
24 years.
25    Q.   Do you remember the name of the

Page 22

1  facility?
2  **A.  Chevron Northpark.**
3  Q.  Was that existing construction or was
4  it new?
5  **A.  New.  It was an expansion of existing**
6  **facility.**
7  Q.  When was the last time you designed a
8  storm water drainage system for an industrial
9  plant in Mississippi?
10 **A.  I have not.**
11 Q.  Do you do any civil engineering work?
12 **A.  This is all civil engineering work.**
13 Q.  Okay.  Would you agree that there are
14 different -- civil engineering is a general
15 heading under which there are numerous --
16 **A.  Yes, sir.**
17 Q.  -- subheadings?
18       Okay.  When was the last time you
19 developed a storm water detention system in a
20 special flood hazard zone?
21 **A.  Off memory, I can't recall if Chevron**
22 **was in a flood zone.  So I -- the answer is, I'd**
23 **have to look at my records to determine if**
24 **Chevron's Northpark facility had that distinction.**
25 Q.  Would that be the only one that comes

Page 23

1  to mind that --
2  **A.  Yes, sir.**
3  Q.  Do you -- we're gonna -- what's gonna
4  happen here is we're gonna get into a
5  conversational-type discussion, and either I'm
6  gonna try to start a question when you're getting
7  ready to answer, or you're gonna answer before I
8  finish.  So in order that she can keep it
9  straight, we've got to -- I will do my best not to
10 start a question when you're answering, if you can
11 hold off on your answers till I finish.
12 **A.  Yes, sir.**
13 Q.  Okay.  When you were developing -- or
14 when you all were doing the plan for Chevron
15 Northpark, did you review any local ordinances,
16 storm water drainage ordinances or anything like
17 that?
18 **A.  Yes, sir.**
19 Q.  And they were in reference to
20 St. Tammany Parish?
21 **A.  Yes, sir.**
22 Q.  Okay.  Was it in the parish, or was it
23 in Covington?
24 **A.  I believe that facility is south of**
25 **Covington city limits, but I think it has the**

Page 24

1  **mailing address of Covington if I recall**
2  **correctly.  It's been a little while since we**
3  **designed that one.**
4  Q.  So it was --
5  **A.  It believe it's -- I believe it's**
6  **unincorporated parish.**
7  Q.  Unin-- -- okay.
8       So when you designed that system,
9  it had to -- you dealt with St. Tammany Parish
10 storm water -- I mean flood ordinances?
11 **A.  Yes, sir.**
12 Q.  Okay.  Now, what did you do in order to
13 prepare for your deposition today?
14 **A.  It's been six months plus since I wrote**
15 **the opinion, so I went back through all our notes**
16 **of all the different communications we had and all**
17 **the different information we had prior, how we**
18 **developed everything.  And then I read the**
19 **additional stuff that had been provided, the**
20 **depositions of the various people.  Some -- some I**
21 **spent more time reading than others.  And that's**
22 **about it.**
23 Q.  Anything other than what's on this
24 thumb drive that you provided to us that you've
25 reviewed?

Page 25

1  **A.  Not to my recollection.**
2  Q.  Okay.  Were you aware that LHJ was
3  hired to do more than just provide a storm water
4  detention system?
5  **A.  I saw documents regarding architectural**
6  **services for a building, and I saw documents**
7  **regarding survey services.**
8  Q.  Right.
9       And the other document, the third
10 contract, was just a general civil engineering
11 contract, correct?
12 **A.  I -- I don't remember exactly which one**
13 **was which, which scope had what services in it.**
14 Q.  Okay.  Did you see where they were
15 hired to do a grading plan?
16 **A.  Yes, sir, I believe that was part of**
17 **their drainage analysis.**
18 Q.  Okay.  But nowhere in there, in any of
19 the contracts, does it say they were hired
20 specifically to solely do a storm water detention
21 system, did it?
22 **A.  Not to the best of my memory.**
23 Q.  Okay.  Now, did you speak to anyone
24 during your preparation for this deposition today?
25 **A.  Mr. Noletto.**

Page 26

1    Q.  Okay.  When you were --
2    A.  And -- and one of the employees in my
3 office who -- who helped me prepare.
4    Q.  Okay.  And other than Mr. Noletto, when
5 you were at the site, did you speak with anyone or
6 did you tour the site with anyone?
7    A.  We had -- one member from Linfield was
8 there that day, and --
9    Q.  Do you remember who that was?
10    A.  It was Nathan Junius.
11    Q.  Okay.
12    A.  And -- and several people from the
13 facility walked with us.  I don't -- I don't
14 really know who they were.
15    Q.  You listed 14 documents or articles in
16 your report that you reviewed.
17          Do you need to add anything to
18 that list, or is that list comprehensive of what
19 you've reviewed?
20    A.  It's not comprehensive of what I've
21 reviewed.  It's comprehensive of what I had
22 reviewed in order to develop this opinion.
23    Q.  Okay.
24    A.  But since then there's been more stuff,
25 but nothing to cause me to change my opinion.

Page 27

1    Q.  All right.  Would you -- do you recall
2 offhand, without looking at any notes, what you
3 reviewed since then?
4    A.  Many of the things that have been
5 disclosed since then, like there's been a couple
6 of depositions I've received.
7    Q.  Do you know which ones in particular?
8    A.  I know I saw one plaintiff's
9 deposition.  I didn't read it in great depth.  I
10 saw Dr. Williams' deposition.  I saw Miss Butler's
11 deposition.  The exhibits of those, I saw.  I
12 think I got Mr. Junius' deposition recently.
13 There was a disclosure very recently of some plans
14 for the rail spur.  That was -- that was within
15 the last week that I received those.
16    Q.  Are they contained in here?
17    A.  They should be contained on the
18 electronic file.
19    Q.  Okay.
20    A.  I don't -- I don't -- the stuff I
21 printed is not all encompassing.
22    Q.  Okay.
23    A.  The electronic file should be.
24    Q.  Okay.  In particular, the
25 second-to-last one, you say that you reviewed a

Page 28

1 post-construction survey prepared by Larry Smith?
2    A.  Yes, sir.
3    Q.  Is that in your electronic file, or is
4 it here?
5    A.  It certainly should be in the
6 electronic file, but it definitely is here.
7          Would you like me to . . .
8    Q.  Sure.  Please.
9    A.  I think this is it.
10    Q.  We'll get back to that in a minute.
11          But while we're waiting for
12 Mr. Rafferty to come back, it also said that you
13 reviewed a pre-construction survey prepared by
14 LHJ?
15    A.  Yes, sir.
16    Q.  Was that the topographical survey?
17    A.  That's the only one I saw.
18    Q.  Okay.
19          MR. NOLETTO:
20          Are you going to make the résumé
21 an exhibit?
22          MR. NEGROTTO:
23          Probably.
24          MR. NOLETTO:
25          Okay.

Page 29

1          MR. NEGROTTO:
2          While we're waiting on Don, why
3 don't we do that.  Why don't we just make his
4 updated résumé an exhibit.
5          MR. NOLETTO:
6          What's that number?
7          THE COURT REPORTER:
8          #3.
9          MR. NEGROTTO:
10          Let's go ahead and make this an
11 exhibit as well.
12          THE WITNESS:
13          Thank you.
14          MR. NEGROTTO:
15          Is that #4?
16 EXAMINATION BY MR. NEGROTTO:
17    Q.  Mr. Martin, you have what's been marked
18 as Exhibit #4.
19          Can you tell us what that is?
20    A.  It appears to be a -- four pages of
21 survey from the facility.
22    Q.  Is that the topographical survey that
23 you reviewed?
24    A.  It appears to be.
25    Q.  Was it broken up into four pages, or

Page 30

1  was it on one?
2      A.  I think the one I have is on one larger
3  page, but I'm not -- I'm not positive.
4      Q.  Now, with respect to that document, do
5  you see where there are any elevations or numbers
6  with regard to inside of what we're gonna call
7  "Alligator Branch," which is on the --
8      A.  It's very difficult to read.
9      Q.  I'm not asking you to read the numbers.
10     A.  Okay.  Okay.
11     Q.  But does it appear to you that there
12 were -- that there were measurements taken inside
13 of Alligator Branch?
14     A.  On this document I see some.
15     Q.  Do you have -- do you know if you have
16 the larger document in here?
17     A.  I don't know.  I feel like I do.
18          I don't have -- I don't have that
19 exact document with me.
20     Q.  Okay.
21     A.  Not on paper at least.
22          What I thought I -- what I was
23 thinking of was this one, which is the grading
24 plan.
25     Q.  Grading plan.  Okay.

Page 31

1      A.  Let me check one more time.  I don't
2  want to -- I want to be exactly correct.
3          No, sir.
4      Q.  Okay.  Okay.  But you said that you
5  think you saw where there were some numbers that
6  were -- that document on the left-hand side of --
7  that may be my oops.
8          Go ahead.
9      A.  I'm gonna hold it northbound upward.
10     Q.  When you do that, on the left-hand
11 side, you see like a dashed-type line?  Does that
12 make sense?  It's a double line with like little
13 black triangles in it on the -- on the west side
14 of that property that runs the length of the
15 property?
16     A.  Oh, I see -- yeah, I don't see any
17 dashes.  I do see that line you're talking about.
18     Q.  Okay.  Does that -- your understanding,
19 that's what indicates Alligator Branch?
20     A.  Yes, sir, that's my understanding.
21     Q.  Okay.  And in any of those documents,
22 do you see where there were actually numbers that
23 were collected inside of that, what looks to be
24 Alligator Branch?
25     A.  Yes, sir.

Page 32

1      Q.  Okay.  Now, this, you say, is the
2  post-construction survey?
3      A.  It was provided to me as a
4  post-construction survey.
5          MR. NEGROTTO:
6              Let's go ahead and just mark this
7  one, then.
8          THE WITNESS:
9              Thank you.
10 EXAMINATION BY MR. NEGROTTO:
11     Q.  If you hold that one in the same
12 orientation -- okay.  If you hold that one with
13 the same orientation --
14     A.  Correct.
15     Q.  -- with north being where it says "Road
16 B" being up --
17     A.  Yes, sir.
18     Q.  -- on the left-hand side, it says
19 "50-foot drainage easement."
20          Do you know if that -- where that
21 designation came from?  Do you know if there's
22 actually a drainage easement there?
23     A.  No, sir, I have no knowledge of that.
24     Q.  Do you know if that indicates Alligator
25 Branch?

Page 33

1      A.  Just by the orientation of the page, it
2  would seem to, but I --
3      Q.  And the reason I'm asking is because
4  right to the left of that, it says "Picayune
5  Industrial Park Boundary."  So I'm wondering if
6  the drainage easement is actually Alligator
7  Branch.  I don't think Alligator Branch is inside
8  the industrial park is what I'm getting at.
9          So you don't know -- you can't
10 help me on that either?
11     A.  No, sir.  This -- this document was
12 provided to me, and . . .
13     Q.  Okay.  Do you know what the survey was
14 supposed to be of?
15     A.  The one in my hand?
16     Q.  Yes.
17     A.  Certainly not.
18     Q.  So you don't know where it says
19 "POB" -- I'm looking -- look below the retention
20 pond.
21          You see a horizontal line going
22 across, and on the right-hand side it says, "POB
23 tract 2"?
24     A.  Yes.
25     Q.  You don't know what that means?

Jeffery Chad Palmer, et al v.
Sun Coast Contracting Services, LLC, et al

James R. Martin, Jr., Ph.D.
January 16, 2017

Page 34

1    A.   No, sir.
2    Q.   Okay.  And this was actually done prior
3  to the second set of construction.
4         Would you agree with that, or do
5  you know?
6    A.   The only thing I know is that it says
7  "Updated 3-10-2015" on the bottom right.
8    Q.   Okay.
9    A.   So that would -- that would indicate
10 something changed on this drawing on that date.
11   Q.   Would that also indicate to you where
12 it says "Updated" that there was a prior survey?
13   A.   It says the date of the field survey
14 was 12-29-2014, so it would seem like they took
15 field data then, and then they updated it on this
16 date.  But that's a supposition I'm making just
17 based on those two dates.
18   Q.   When did you say you got a copy of
19 this?
20   A.   I saw this on paper at the facility
21 during the tour, and we asked for a copy, and they
22 provided us one at a later date.  I don't remember
23 when.  It wasn't immediate.
24   Q.   I'm just curious why we've asked for
25 numerous surveys and never been provided a copy of

Page 35

1  this.  Okay.
2         You took some photographs when you
3  were at the site, correct?
4    A.   Yes, sir.
5    MR. NOLETTO:
6         Just for clarification, this was
7  not part of the LHJ file.
8    MR. NEGROTTO:
9         I understand.
10   MR. NOLETTO:
11        Okay.
12 EXAMINATION BY MR. NEGROTTO:
13   Q.   Have you talked to any witnesses
14 that -- people that you know to be a witness in
15 this case?
16   A.   No, sir.
17   Q.   Okay.  Other than the plant people that
18 were present when you did the walk-through and
19 Mr. Junius, have you talked to anybody else -- and
20 Mr. Noletto -- about this case?
21   A.   The engineer in my office who helped
22 me.  Other than that, no.
23   Q.   Okay.  You said you asked for that
24 survey and were eventually given a copy of it.
25        Did you ever ask for any

Page 36

1  engineering work done by anybody else?
2    A.   There -- there was -- there's reference
3  to Aqua Engineering throughout a lot of the
4  different files.
5    Q.   Right.
6    A.   And we -- we did ask if they had
7  provided something, and I think very recently we
8  received something from -- from that.  I think.
9    Q.   Was it the no-rise certificate?  Is
10 that what you're --
11   A.   Yes, sir, I believe so.  I believe
12 that's -- I believe that's right.
13   Q.   So other than that --
14   A.   No, sir.
15   Q.   Okay.  So do you feel comfortable that
16 you've reviewed all the engineering data that you
17 feel is applicable to your opinion?
18   A.   I can't know what exists that I don't
19 know exists, if that is a good enough answer.
20   Q.   Well, that's why I asked you before if
21 you had asked for anything.
22   A.   Oh, no.  There's nothing I've asked for
23 that -- there's nothing I've sought out that was
24 not provided that I needed.
25   Q.   Well, do you think there's anything out

Page 37

1  there that --
2    A.   Not that I'm aware of.
3    Q.   Okay.
4    THE WITNESS:
5         Sorry.
6  EXAMINATION BY MR. NEGROTTO:
7    Q.   What is a grading plan?
8    A.   A grading plan is a document, typically
9  part of a bigger set of documents, that provides
10 elevations for a site.
11   Q.   And by "elevations," explain what you
12 mean by elevations.
13   A.   It provides the contractor information
14 as to what vertical location the site should be in
15 its final configuration.
16   Q.   Would you agree with me that if the
17 natural topography is below the finished level
18 at where the construction should be, that you have
19 to put fill dirt in there to get from natural
20 topography to where you need to be?
21   A.   Can you simplify that question a little
22 bit?
23   Q.   Do you know if there was fill dirt put
24 on this site?
25   A.   I don't know.

Page 38

1  Q.  So when you reviewed the plans and the
2  topographical survey, you did not see where the
3  finished elevation of the control building, of the
4  drainage catch basins, you don't -- you didn't see
5  where they had to add fill dirt in the drawings?
6  **A.  I didn't look for that.  I was**
7  **looking -- that wasn't what I needed to look at to**
8  **investigate if the water moved in the right**
9  **directions.**
10  Q.  Then would you agree with me that the
11  detention drainage pond is based -- the
12  drainage -- and if I'm using the wrong term, you
13  correct me.
14         The catch basin's where the actual
15  rainwater comes in?
16  **A.  (Affirmative response.)**
17  Q.  For the water to get from there to the
18  detention pond --
19  **A.  (Affirmative response.)**
20  Q.  -- is it pumped, or is it gravity flow?
21  **A.  Gravity flow.**
22  Q.  So you would agree that the catch
23  basins would have to be elevated to a certain
24  point where the gravity would pull it towards the
25  detention pond?

Page 39

1  **A.  The invert of the catch basin would**
2  **have to be higher than the invert of the**
3  **downstream receiving structure.**
4  Q.  And in this case, did you -- when you
5  looked at the drawings, was that the case?
6  **A.  Yes, sir.**
7  Q.  Okay.
8  **A.  I should clarify.  Higher or the same.**
9  **It is possible for them to be flat.**
10  Q.  Okay.  Prior to your site visit, were
11  you aware of any of the conditions at the site
12  where the plant was built with regard to
13  topography, vegetation, anything of that nature?
14  **A.  The time line, I don't recall.  I don't**
15  **know when I started pulling together data and when**
16  **we actually went to the visit.  But I have -- I**
17  **have researched as well as possible what was there**
18  **prior to the development.**
19  Q.  And what was there prior that you
20  found?
21  **A.  If I may, I have a document.**
22  Q.  Sure.  (Affirmative response.)
23  **A.  But I can be describing it while I'm**
24  **looking for it.  It's a Google Earth picture from**
25  **2011 that shows the site from above.**

Page 40

1  Q.  And would you -- well, let's let you
2  find it.
3  **A.  It's got to be in here.  Here we go.**
4  Q.  We're gonna -- Don's gonna get some
5  copies made.
6         Are you familiar with that without
7  having to look at it?
8  **A.  To some degree.**
9  Q.  Okay.  Would you agree with me that the
10  site where the plant is located was pretty much
11  flat land?
12  **A.  I can't tell the slope from that**
13  **picture, but it would seem to be flat based on**
14  **everything else.**
15  Q.  And -- but there wasn't a whole lot of
16  trees or --
17  **A.  Correct.  It seemed --**
18  Q.  There wasn't a whole lot of trees, no
19  buildings or anything of that nature?
20  **A.  Correct.  It appears from the aerial**
21  photography to be somewhat open ground without a
22  **lot of vegetation on it.**
23  Q.  And so your -- did any of your research
24  show or indicate to you that that area, what was
25  called the "floodplain" for Alligator Branch, that

Page 41

1  water flowed across?
2  **A.  What was the question?**
3  Q.  When Alligator Branch went over its
4  banks, was there anything that indicated to you
5  that that land, that flat land where the plant is
6  now, served as the floodplain for Alligator
7  Branch?
8  **A.  No, sir.**
9  Q.  No.
10         Did you see anything that said it
11  wasn't?
12  **A.  No, sir.**
13  Q.  Okay.
14  **MR. NEGROTTO:**
15         Thank you.
16  **EXAMINATION BY MR. NEGROTTO:**
17  Q.  Have you reviewed anything by the
18  plaintiffs with regard to what they are
19  complaining about --
20  **A.  Yes, sir.**
21  Q.  -- with regard to LHJ?
22  **A.  I don't know that the plaintiffs**
23  **specifically named LHJ's work.**
24         **Do they?**
25  Q.  Well, I don't know.

Page 42

1    I'm asking you if you know if they
2  have made any specific complaints against LHJ?
3    **A.  No.  The complaints that I read were**
4  **not specific to a company.**
5    Q.  Okay.  And what were those complaints
6  that you read?
7    **A.  Structural damage.  There was**
8  **subsidence issues, sinkholes, increased flooding.**
9  **Those were the claims that I recall.**
10    Q.  And who do they attribute those damages
11  to?
12    **A.  If I recall, it's the general fact that**
13  **the site exists now.**
14    Q.  Okay.
15    **A.  But I don't really remember.**
16    Q.  Okay.  You don't have any independent
17  knowledge as to whether or not the claims that
18  they're making actually exist or not, do you?
19    **A.  Correct, I don't have opinions on that.**
20    Q.  But you were not there during the time
21  that they experienced the complaints that --
22    **A.  Correct.**
23    Q.  Okay.  Were you familiar that there was
24  some wetlands on the plant property prior to its
25  construction?

Page 43

1    **A.  That's not how I understand it to be.**
2  **I understand, based on the documents I have, that**
3  **there were wetlands on the overall property, but**
4  **the portion that was developed into the plant did**
5  **not contain wetlands.**
6    Q.  Okay.  Where did you get that
7  information from?
8    **A.  From one of the drawings that was**
9  **provided.**
10      **This -- I don't believe this is a**
11  **final configuration, but this is why I based my**
12  **opinion -- this is why I didn't think wetlands --**
13      **(Whereupon there was an**
14  **interruption in the deposition and a discussion**
15  **was held off the record.)**
16  **EXAMINATION BY MR. NEGROTTO:**
17    Q.  So you haven't seen any delineations or
18  anything of what existed prior to the plant?
19    **A.  Not to my recollection.**
20    Q.  Okay.  And you said you're not --
21  you're not aware of whether any fill dirt was put
22  on that site or not?
23    **A.  Correct.**
24    Q.  So if the drawings say that they needed
25  1.4 feet of fill dirt, would the drawings be what

Page 44

1  was required or what was suggested?
2    **A.  The plans as developed would be what**
3  **the engineer intended.  But what actually was**
4  **built, I don't know if the engineer had**
5  **construction personnel observing construction or**
6  **if -- I really only know what was on the paper.**
7    Q.  So what you're saying is, if the design
8  said that you had to put fill dirt in order to get
9  to the final elevation, then that's what the
10  engineer intended?
11    **A.  Correct.**
12      **MR. NOLETTO:**
13      Is that #7?
14  **EXAMINATION BY MR. NEGROTTO:**
15    Q.  Dr. Martin, do you see what's been
16  marked as Exhibit #7?
17    **A.  Yes, sir.**
18    Q.  Do you recognize that as one of the
19  pictures you took?
20    **A.  It could be.  I don't recall if I took**
21  **this exact picture.**
22    Q.  If it was in the documents you produced
23  to us?
24    **A.  Yes, sir.**
25    Q.  Okay.  Can you tell us what that is?

Page 45

1    **A.  That appears to be the pond on the day**
2  **of our visit.**
3    Q.  Okay.  What are those two pipes -- if
4  you're holding that with the trees to the top --
5    **A.  (Affirmative response.)**
6    Q.  -- what are those two pipes on the
7  right?
8    **A.  Those would be discharge pipes from the**
9  **site, draining the site into the pond.**
10    Q.  Okay.  And that would be where a series
11  of pipes came from the detention basins and then
12  eventually connected to where we only have two
13  pipes coming into the pond?
14    **A.  There's only one detention basin.**
15    Q.  I'm sorry.  Catch basin?
16    **A.  Oh, correct.  Yes, sir.**
17    Q.  I told you I'm not gonna be good at
18  these terms.
19      And would you agree with me that
20  obviously, with the storm water, is coming a lot
21  of sand?
22    **A.  Yes.**
23    Q.  Do you know how deep that pond was
24  before all of this sand started building up?
25    **A.  I can only assume it was built to the**

Jeffery Chad Palmer, et al v.
Sun Coast Contracting Services, LLC, et al

James R. Martin, Jr., Ph.D.
January 16, 2017

Page 46

1  required dimensions in the plans, but I don't have
2  a measurement to know exactly how it was
3  completed.
4      Q.  Do you know how much sand has deposited
5  in the pond?
6      A.  No, sir.  I imagine that changes on a
7  daily basis.
8      Q.  Okay.  And would you agree with me that
9  the accumulation of sand affects the ability or
10 the capacity -- the holding capacity of the pond?
11     A.  Yes.
12     Q.  Okay.  This next picture is also one
13 that we have -- it's actually got LHJ 006008 in
14 the bottom right-hand corner.  The previous one,
15 Exhibit #7, has LHJ 006000 in the bottom
16 right-hand corner.
17              Do you know if this -- does this
18 look familiar to you as one of the ones you took?
19     A.  Yes, sir.  Or one just like one of the
20 ones I took.
21     Q.  Okay.  Do you know how those concrete
22 barriers got put right there?
23     A.  No, sir.
24     Q.  Do you see the gentleman standing on
25 the -- if we -- if we have -- if we hold it to

Page 47

1  where the people are standing upright, you know,
2  there's three guys on the left side of that
3  concrete barrier, and three guys -- and one man
4  standing on the right side of that barrier,
5  correct?
6      A.  Yes, sir.
7      Q.  Do you know the difference in elevation
8  between where the man's standing on the right, the
9  difference of elevation between the natural bank
10 and how much fill dirt was put between those
11 concrete barriers and Alligator Branch?
12     MR. NOLETTO:
13          Object to the form.
14          You can answer if you know.
15     THE WITNESS:
16          I don't know.
17 EXAMINATION BY MR. NEGROTTO:
18     Q.  You don't know.  Okay.
19          Would you agree with me that -- as
20 a hydrologist, that if water was to come over the
21 top of those banks and hit those concrete walls,
22 it'd push it back into Alligator Branch?
23     A.  It depends on a lot of things, but that
24 could happen.
25     Q.  Okay.  And would you also agree with me

Page 48

1  that if the natural bank of Alligator Branch is 2
2  feet below where that man is standing on the right
3  side, that that 2 feet of fill dirt that was
4  placed there, would it also push water back into
5  Alligator Branch?
6      MR. NOLETTO:
7          Object to the form.
8      MS. GREGORY:
9          Object to the form.
10     THE WITNESS:
11          Again, it depends on a great deal
12 of things:  What's going on on this bank, the
13 other bank; the velocity of the water; the
14 openings in the concrete barriers.  So I'd say it
15 could happen, but I -- but I don't know if it
16 would happen.
17 EXAMINATION BY MR. NEGROTTO:
18     Q.  Okay.  Well, as a general theory,
19 assuming both -- assuming the banks on both sides
20 are equal, and the water would go over the bank,
21 would the deposit of a fill dirt on top of one
22 bank cause the water to push back into Alligator
23 Branch?
24     A.  If the question is all else equal,
25 meaning everything else equal, if one side of the

Page 49

1  bank is higher than the other, that would
2  influence the branch, but also the other flood
3  bank.  So again, it's not enough information to
4  say exactly what would happen.  It would -- it
5  would -- it would change something.  It would be
6  one variable of a very complex equation that had
7  been changed.
8      Q.  Okay.
9      THE WITNESS:
10          Thank you.
11     MR. NEGROTTO:
12          Is that #9?
13 EXAMINATION BY MR. NEGROTTO:
14     Q.  Dr. Martin, I've handed you what's been
15 marked Exhibit #9, which on the bottom right
16 corner has LHJ 006016.
17          Holding that picture with the
18 mounds of sand on the right and the silt fence on
19 the left --
20     A.  (Affirmative response.)
21     Q.  -- from that -- I'm assuming this
22 picture was taken by you since it was produced in
23 your production?
24     A.  It seems possible.
25     Q.  Would you agree with me that the level

Page 50

1　of the ground on the right side of the silt fence
2　is higher than the level of the ground on the left
3　side of the silt fence?
4　　**A.　I --**
5　　　**MS. GREGORY:**
6　　　　Object to the form.
7　　　**THE WITNESS:**
8　　　　I can't see the ground on the left
9　side of the silt fence.
10　**EXAMINATION BY MR. NEGROTTO:**
11　　Q.　So you couldn't -- by looking at this
12　picture, when you took this picture, you couldn't
13　tell that this sand row that's running along the
14　silt fence is higher than the ground where the
15　trees are?
16　　**A.　From -- that was six months or -- six**
17　**months ago. I don't remember that, and I can't**
18　**see from the picture what exactly is happening**
19　**just on the other side of the silt fence. It**
20　**could be the same; it could be higher.**
21　　Q.　But you would agree with me that those
22　mounds of sand on the right are definitely higher
23　than what's on the left?
24　　**A.　Yes, sir.**
25　　Q.　This isn't really a good picture.

Page 51

1　　　Before I even mark this, if you
2　would take a look at that and tell me if you
3　remember why you took that picture. It's black
4　and white. It's not really a good picture.
5　　**A.　I could venture a guess, but I don't**
6　**have a I took this because of that reason. I'm**
7　**sorry.**
8　　Q.　Okay. All right. Then let me ask this
9　question before we even mark it.
10　　　Can you tell from that -- from
11　that reproduction that the grassy land behind this
12　sand that you were standing on is higher or lower
13　than where you were standing?
14　　**A.　I mean, I can't even tell if it's**
15　**ground or trees back there.**
16　　Q.　Okay. That's --
17　　**A.　That . . .**
18　　Q.　That's okay.
19　　**A.　That's a terrible photograph. Sorry.**
20　　Q.　Well, it's good in color.
21　　**A.　Sorry. If I took that one, I**
22　**apologize.**
23　　　**MR. NOLETTO:**
24　　　　It's good in color.
25　　　**MR. NEGROTTO:**

Page 52

1　　　Your picture is much better than
2　that reproduction.
3　　　　(Whereupon discussion was held off
4　the record.)
5　**EXAMINATION BY MR. NEGROTTO:**
6　　Q.　Are you aware that the sand plant or
7　the plant -- the facility itself was in built in
8　an AE flood zone?
9　　**A.　I'm aware of that from the**
10　**documentation, but it wasn't part of my**
11　**investigation.**
12　　Q.　And so since it was built in an AE
13　flood zone, you would then agree that the local
14　flood ordinance would have been applicable to the
15　construction there?
16　　　**MS. GREGORY:**
17　　　　Object to the form.
18　　　**THE WITNESS:**
19　　　　It wasn't part of my
20　investigation, but that seems reasonable.
21　**EXAMINATION BY MR. NEGROTTO:**
22　　Q.　Okay. Well, earlier you talked about
23　the Chevron plant, and your experience was because
24　if it was built in a flood zone, then you would
25　have -- the St. Tammany flood zone ordinance would

Page 53

1　have been applicable to you?
2　　**A.　That's not what I said.**
3　　Q.　Okay. Then what did you say?
4　　**A.　What I said was that because the**
5　**detention basin at the Northpark facility was**
6　**governed by the St. Tammany -- unincorporated**
7　**St. Tammany Parish drainage ordinances, we had to**
8　**abide by their discharge rules. So just like**
9　**we're trying to show whether or not the peak flow**
10　**before and after were the same or less or greater**
11　**in St. Tammany, there's a similar rule. It's**
12　**actually much more stringent in St. Tammany, but**
13　**we have to abide by that.**
14　　　**But it wasn't a matter of the**
15　**flood ordinances so much as the drainage**
16　**ordinance.**
17　　Q.　Okay. Well, then let me ask this.
18　　**A.　What I said about the drainage, I**
19　**didn't remember if it was in a flood zone.**
20　　Q.　Okay.
21　　**A.　And I don't.**
22　　　　(Whereupon discussion was held off
23　the record.)
24　**EXAMINATION BY MR. NEGROTTO:**
25　　Q.　Dr. Martin, have you seen Exhibits #10,

Page 54

1 [#11](#) and [#12](#) that I just -- that you were just
2 handed?
3   **A. Yes, sir.**
4   Q.  And where did you see them?
5   **A.  They were disclosed maybe as attachment**
6 **to someone's deposition.  I don't recall.**
7   Q.  Okay.  And without getting into
8 specifics, would -- I'd like to ask you, then, if
9 those ordinances, whether they'd be for the City
10 or the County, require that certain engineering be
11 performed before any offsite fill dirt is put in a
12 development, would you -- or do you agree that
13 it'd be reasonable that those ordinances need to
14 be complied with if you're doing a development
15 where offsite fill dirt needs to be put when it's
16 in a special flood hazard zone?
17   **A.  It was a very long question.**
18        **Could you --**
19   Q.  Okay.  We're in a -- you agree we're in
20 a special flood hazard zone, an AE zone, correct?
21   **A.  Based on what I've read.**
22   Q.  Okay.  And would you agree with me that
23 if there's an ordinance, whether it be City,
24 County or in covenants, that says if you're gonna
25 build in a special flood hazard zone, and it's

Page 55

1 gonna require offsite fill dirt, that you have to
2 perform certain engineering work?  Is it -- do you
3 agree that it's reasonable that those ordinances
4 should be complied with?
5   **MR. NOLETTO:**
6        Object to the form of the question
7 in that who is the "you"?
8   **THE WITNESS:**
9        If the general question is should
10 the law be followed, I think yes.
11 **EXAMINATION BY MR. NEGROTTO:**
12   Q.  Okay.  That's all I need to know.
13 That's the general question.
14        So that I understand your opinion,
15 if there are city ordinances and/or covenants that
16 provide for what should be done or should not be
17 done with regard to development in a special flood
18 hazard zone, we agree that those ordinances and
19 rules should be followed?
20   **MR. NOLETTO:**
21        Object to the form.
22   **MS. GREGORY:**
23        Object to the form.
24   **THE WITNESS:**
25        I thought that's what I answered

Page 56

1 before.
2 **EXAMINATION BY MR. NEGROTTO:**
3   Q.  Okay.
4   **A.  Has it been changed?**
5   Q.  No.  I just want to make sure that
6 we're on the same page.
7        When we looked at that
8 topographical survey earlier and there were some
9 measurements that were down in Alligator Branch,
10 would those -- if you knew the length of Alligator
11 Branch and the dimensions as far as width and
12 depth, you, as a hydrologist, would be able to
13 calculate the volume of water that would flow
14 through that branch, correct?
15   **A.  It's really more hydraulics than**
16 **hydrology.  But if we knew the length and the**
17 **dimensions of the channel, we could calculate the**
18 **volume it could hold.**
19   Q.  Okay.  Are you familiar with the
20 culverts that go under Ravenwood Drive?
21   **A.  Not -- no, sir.  I saw them.**
22   Q.  Okay.  You saw them?
23   **A.  Yes, sir.  That's my familiarity.**
24   Q.  Okay.  But if you had X number of
25 culverts with a certain amount of dimension, you

Page 57

1 could calculate how much water could pass through
2 those as well, couldn't you?
3   **A.  Well, that's a different calculation**
4 **than before.  Before we were talking about**
5 **volume --**
6   Q.  Volume.
7   **A.  -- which isn't -- which isn't moving.**
8 **Capacity of culverts is actually not very simple.**
9 **It involves inlet control versus outlet control.**
10 **It involves tail water and head waters, and I**
11 **definitely wouldn't -- I don't know anything near**
12 **enough to answer about those culverts**
13 **hydraulically.**
14   Q.  But is it a calculable figure?  Can it
15 be calculated?
16   **A.  The amount of water that could flow**
17 **through the culverts?**
18   Q.  Yes.
19   **A.  Yes.**
20   Q.  Okay.  Let me ask you this question.
21        If you -- I'm gonna -- if you have
22 a five-gallon bucket of water, and the specific
23 gravity was less than 1, and you put a brick in
24 it, what would ha- -- and it was filled to the top
25 before you put the brick, what's gonna happen to

Page 58

1  the water?
2      A.   I -- I think you mean the specific
3  gravity is more than 1, right?
4      Q.   More than 1, correct.
5      A.   Because if the specific gravity's less
6  than 1 --
7      Q.   I've got it halfway right.
8      A.   Nothing would happen if the specific
9  gravity was less than 1.
10     Q.   Okay.
11     A.   If the specific gravity is more than 1,
12  the -- the brick would sink relative to what that
13  specific gravity number is.  It would sink at some
14  speed and -- and displace an equal volume of water
15  that the brick -- it would displace a volume of
16  water equal to the volume of the brick.
17     Q.   Which would then overflow out of the
18  five-gallon bucket, correct?
19     A.   Assum- -- yeah, assuming the bucket was
20  filled to the very top of the brim.
21     Q.   All right.  Now, you went through --
22  you read -- or did you read Jill Butler's report?
23     A.   Yes, I read her original report and
24  amended report and portions of her deposition.  It
25  was a lot of reading.

Page 59

1      Q.   Okay.  Did you look at only her
2  calculations with regard to the detention pond, or
3  did you look at the other parameters of her report
4  as well?
5      A.   When you -- when you say "with regard
6  to the detention pond," my assumption is you mean
7  with regard to the drainage of the facility coming
8  to the detention pond?
9      Q.   And going out.
10     A.   Yes.  That -- I restricted my review to
11  the -- the site drainage of the facility.
12     Q.   Okay.  So you don't have an opinion
13  contrary to her opinion other than the actual
14  calculations with regard to the pond?
15     A.   Correct.
16     Q.   Okay.  In fact, I think in your
17  opinion, you stated in response to some of the
18  things she said.  And if I'm not mistaken, for
19  example, in the second-to-last page, which I guess
20  would be Page 5, your first bullet point, it talks
21  about, "The flood damage prevention ordinance of
22  the City of Picayune and Pearl River" --
23     A.   (Affirmative response.)
24     Q.   -- "prohibit the placement of
25  obstructions in the floodplain."

Page 60

1              Your response to her statement
2  there is "The above conclusion does not pertain to
3  the analysis and design performed by LHJ"?
4      A.   Yes.
5      Q.   That's simply with regard to what's
6  going into and what's coming out of the storm
7  water drainage system, correct?
8      A.   I don't think so.  My understanding was
9  a separate engineering firm was retained to deal
10  with the floodplain issue.  That's why I mentioned
11  before about the Aqua company.  So my
12  understanding is Linfield was not -- it was not
13  part of Linfield's scope to evaluate this issue.
14     Q.   But if the Linfield design required
15  placement of fill dirt in a special flood hazard
16  zone, you're telling me that as part of their
17  civil engineering contract, they had no obligation
18  whatsoever to determine or to follow the
19  ordinance?
20     A.   Not if they were under the impression
21  that another company was hired to provide that --
22  that service.
23     Q.   Well, what if the other company simply
24  did calculations for the rail spur, had nothing to
25  do with the facility?

Page 61

1      A.   The other company should have -- I
2  mean, I guess my understanding is that Aqua was
3  tasked to determine whether or not this issue
4  existed.  But I don't have their contract, so I
5  can't be positive about that.  But based on my
6  understanding of Linfield's scope is that they
7  were to design a drainage detention system.
8      Q.   Well, that's why I asked you.
9              Where does it say that in the
10  contract?  I didn't see that where it says they
11  were tasked only to design the drainage detention
12  system.
13     A.   I guess we could go through the
14  contract, but --
15          MR. NOLETTO:
16              Yeah, let's do that.
17  EXAMINATION BY MR. NEGROTTO:
18     Q.   Yeah, let's do that.  Please.
19     A.   That's why I wrote the conclusion that
20  way.
21              This is -- this is one that I
22  have.  I don't know that this is the most current.
23  Again, I'm not . . .  The architectural scope.
24  This is the survey scope.
25              So I have -- you may already have

Page 62

1 them. I don't know. These are the three I have.
2 I have one from the 5th of March, the 20th of
3 January and the 16th of December.
4    Q.   Which one is the 5th of March? Which
5 one is that?
6    A.   Architectural.
7    Q.   Okay.
8    A.   So I -- like I said, I didn't look at
9 that much at all. I don't -- I'm not an expert in
10 architecture.
11    MR. NOLETTO:
12       Since you brought this up, go
13 ahead and look at them all to see if you see
14 anywhere they were ta- -- if Linfield was tasked
15 with the duty --
16    THE WITNESS:
17       Well, to be --
18    MR. NOLETTO:
19       -- undertook as part of their
20 scope, any evaluation of the floodplain issues.
21    MR. NEGROTTO:
22       Well, that's not the question.
23    THE WITNESS:
24       What's the question?
25 EXAMINATION BY MR. NEGROTTO:

Page 63

1    Q.   The question is: Can you show me where
2 their work was limited strictly to design of a
3 detention basin?
4    A.   Well, based on what I have in front of
5 me -- and, again, I'm not an attorney. My
6 expertise is in hydraulics. But this says, "These
7 services do not include drainage calculations,
8 detention design, wetland issues, LEED testing
9 [sic], testing, SWPPP, permitting, geotechnical
10 engineering or construction phase site services."
11    MR. NOLETTO:
12       You read that a little fast for
13 her.
14    THE WITNESS:
15       I'm sorry.
16       Well, you can have it.
17       But it says, "The design will
18 include surface and subsurface drainage from the
19 proposed 25-acre, 36-acre and five-acre properties
20 as shown on the attached conceptual plan by
21 Norfolk Southern Railroad dated 12-1 to the
22 existing ditch along the western edge of the
23 property." That's all I have as far as their
24 scope for this -- the work that I was looking at.
25 EXAMINATION BY MR. NEGROTTO:

Page 64

1    Q.   But it says that they will include
2 surface and subsurface drainage, correct?
3    A.   It does say that.
4    Q.   Okay.
5    A.   That's the first sentence.
6    Q.   To the existing ditch along the western
7 edge of the property, correct?
8    A.   Correct.
9    Q.   Okay. Which is Alligator Branch,
10 right?
11    A.   To the best of my knowledge.
12    Q.   Okay. Now, regardless of what they
13 said it was not gonna be included in there, they
14 said that they were gonna do surface and
15 subsurface drainage?
16    A.   Correct.
17    Q.   All right. Now, so what you're
18 saying -- and let me make sure I understand
19 this -- when an engineer takes on the task of
20 providing surface and subsurface drainage, and the
21 ordinance requires that that engineering work or
22 that design work, if it requires fill dirt to be
23 placed in a special flood hazard zone, the
24 engineer does not have to comply with the local
25 ordinances?

Page 65

1    A.   That's not what I said.
2    Q.   Okay. Well, would you agree that the
3 engineer would have to comply with the local
4 ordinance?
5    A.   I would agree an engineer has to comply
6 with the local ordinances.
7    Q.   Okay. And if there is no --
8    MR. NOLETTO:
9       An engineer, not the engineer.
10    THE WITNESS:
11       An engineer, correct.
12 EXAMINATION BY MR. NEGROTTO:
13    Q.   And if there is no engineer doing work
14 on that part of the site, i.e., Aqua --
15    A.   I don't know what Aqua's scope was.
16 That's my understanding.
17    Q.   Okay. Well, let's assume Aqua was
18 strictly limited to the rail spur.
19    A.   Okay.
20    Q.   And you're not aware of any other
21 engineer that's supposedly doing the floodplain
22 and all that work for the site where you're
23 designing your plant, then whose responsibility is
24 it?
25    A.   If it was not Aqua's responsibility, it

Jeffery Chad Palmer, et al v.
Sun Coast Contracting Services, LLC, et al

James R. Martin, Jr., Ph.D.
January 16, 2017

---

Page 66

1  would certainly be someone's responsibility.  But
2  like I said, the -- you're -- the caveat you're
3  adding changes the whole understanding I have.
4      Q.   Okay.
5      A.   If you're saying it's not Aqua's
6  responsibility.
7      Q.   Well, Aqua's -- you said you looked at
8  Aqua's --
9      A.   No, I don't have their scope.
10     Q.   Oh, you don't have their scope?
11     A.   No.  Not -- not to my knowledge.  Let
12  me -- let me say I don't think I have it.  There
13  was -- there's a lot of documentation produced in
14  the last very short period of time, so if it's in
15  my file and I haven't reviewed it, that's
16  possible.  But I don't think I have it.
17     Q.   So if Aqua's scope -- well, strike
18  that.
19          MR. NEGROTTO:
20              Why don't we take about a
21  five-minute break.
22          (Whereupon a recess was taken.)
23  EXAMINATION BY MR. NEGROTTO:
24     Q.   Dr. Martin, you're licensed in
25  Mississippi, correct?

---

Page 67

1      A.   Yes.
2      Q.   And would you agree with me that there
3  is a code of professional conduct with regard to
4  engineers in that state?
5      A.   There's a -- yes, sir.
6      Q.   Okay.  And would you agree with me that
7  every engineer who practices in the state of
8  Mississippi should follow that code of
9  professional conduct?
10     A.   Yes, sir.
11          MR. NEGROTTO:
12              I don't think I have any more
13  questions.
14          MR. NOLETTO:
15              I have a couple.
16  EXAMINATION BY MR. NOLETTO:
17     Q.   Dr. Martin, you've looked over the
18  three contracts that LHJ entered into, correct?
19     A.   Yes, sir.
20     Q.   Is there anything in any of those three
21  contracts that shows LHJ undertook as its scope
22  work related to the floodplain ordinance we've
23  been talking about?
24     A.   No, sir.
25     Q.   You're a professional engineer, are you

---

Page 68

1  not?
2      A.   Yes, sir.
3      Q.   All right.  Is the work you do for a
4  client determined by the scope that the client
5  defines for you?
6      A.   Yes, sir.
7      Q.   Okay.  You assumed that Aqua had as
8  part of its scope the floodplain ordinance work;
9  is that correct?
10     A.   That was my understanding from reading
11  the documents that have been provided to me.
12     Q.   And there have been representations to
13  you today that that may have only applied to the
14  spur activity at the site, correct?
15     A.   That's what was said today.
16     Q.   Okay.  You don't have any independent
17  knowledge one way or the other?
18     A.   No, sir.
19     Q.   Okay.  So as we sit here today, you
20  don't know what engineer, if any, actually had
21  been assigned to it or undertook the work to
22  analyze the floodplain ordinance as it relates to
23  the site where the plant is itself, correct?
24     A.   Correct, yes, sir.
25     Q.   All right.  But you do know based upon

---

Page 69

1  what you reviewed and in terms of the written
2  documentation, and also the review of the
3  deposition of Nathan Junius which you have
4  reviewed?
5      A.   Yes, sir.  I've reviewed it.  I
6  wouldn't say I memorized it.
7      Q.   Sure.
8              But did you see in either the
9  contracts or that deposition any evidence that
10  Linfield undertook as part of its scope the study
11  of the floodplain ordinance and compliance
12  therewith?
13     A.   No, sir.
14          MR. NOLETTO:
15              That's all.  Thanks.
16          MR. NEGROTTO:
17              One more question.
18          THE WITNESS:
19              Yes.
20          MR. NEGROTTO:
21              Oh, I'm sorry.
22          MS. GREGORY:
23              No, I don't have any questions.
24          THE WITNESS:
25              Yes, sir.

---

Page 70

1  **EXAMINATION BY MR. NEGROTTO:**
2     Q.  Then let me ask you this:  You read
3  Miss Butler's opinion?
4     **A.  I read -- I think I answered that**
5  **already.**
6     Q.  Yeah.
7            And would you agree with me that
8  in Miss Butler's opinion, LHJ had the
9  responsibility to make sure that their design was
10  in compliance with the flood ordinance?
11    **A.  I don't know if she said that in her**
12  **opinion or not.  I don't recall that.  She may**
13  **have said that; I don't recall.**
14    Q.  Well, do you have any reason to believe
15  that that is inaccurate?
16    **A.  That she said that?**
17    Q.  No, that Linfield -- that LHJ had the
18  responsibility to take into consideration the
19  floodplain ordinance when their design required
20  offsite fill dirt to be put in a flood zone,
21  special flood hazard zone?
22    **A.  Could you repeat that question?**
23  **Because before we were talking about what**
24  **Miss Butler's opinion was, and you're asking me --**
25  **but now you're asking what my opinion is?  I'm not**

Page 71

1  **understanding exactly what you're asking me.**
2     Q.  Well, let me ask you this:  Do you have
3  any -- what are your objections to Miss Butler's
4  opinions that were provided in her report?
5     **A.  I laid them out in my response very**
6  **clearly.**
7     Q.  Okay.  And for those where you say that
8  it did not apply or that her opinion didn't apply
9  because it was not part of the scope, then you
10  don't have any way -- or you don't plan to
11  contradict her opinions in any way, shape or form?
12    **A.  Correct.  I would stand by what I wrote**
13  **in the report, which is that, "The above**
14  **conclusion does not pertain" -- I'll go slowly.**
15  **I'm sorry.  "The above conclusion does not pertain**
16  **to the analysis and design performed by LHJ and,**
17  **as such, was not part of this evaluation."**
18    Q.  Okay.  Yeah, yeah.
19            Specifically, when you state that,
20  you mean as part of your evaluation?
21    **A.  Well, I was reading it from a document,**
22  **so it was implied that it was part of this**
23  **document, yes.**
24    Q.  So you didn't -- you didn't take that
25  into consideration with regard to your evaluation?

Page 72

1     A.  Correct.
2        **MR. NEGROTTO:**
3            Okay.  That's it.
4        **MR. NOLETTO:**
5            Okay.
6            (Whereupon the deposition was
7  concluded at 12:46 p.m., and the witness was
8  excused.)

Page 73

1                    REPORTER'S CERTIFICATE
2
3            I, CINDY ROGERS LA COUR, C.M.,
4  Certified Court Reporter and Notary Public of
5  Harrison County, Mississippi, do hereby certify
6  that the above-named witness, after having been
7  first duly sworn by me to testify to the truth,
8  did testify as hereinabove set forth;
9            That the testimony was reported by me
10  in shorthand and transcribed under my personal
11  direction and supervision, and is a true and
12  correct transcript, to the best of my ability and
13  understanding;
14            That I am not of counsel, not related
15  to counsel or the parties hereto, and not in any
16  way interested in the outcome of this matter.
17
18
19            CINDY ROGERS LA COUR, C.M.,
               CERTIFIED COURT REPORTER
20            Mississippi CSR #1652
21
22  My Commission Expires:
23  June 10, 2017
24
25

## #

**#1 (2)**
6:8;10:8
**#10 (1)**
53:25
**#11 (1)**
54:1
**#12 (1)**
54:1
**#2 (1)**
10:15
**#3 (1)**
29:8
**#4 (2)**
29:15,18
**#7 (3)**
44:13,16;46:15
**#9 (2)**
49:12,15

## [

**[sic] (1)**
63:9

## A

**abide (2)**
53:8,13
**ability (2)**
7:21;46:9
**able (2)**
7:5;56:12
**above (2)**
39:25;60:2;71:13,15
**above-mentioned (1)**
5:3
**accordance (1)**
4:7
**accumulation (1)**
46:9
**across (2)**
33:22;41:1
**activity (1)**
68:14
**actual (2)**
38:14;59:13
**actually (12)**
12:11;31:22;32:22;
33:6;34:2;39:16;42:18;
44:3;46:13;53:12;57:8;
68:20
**add (2)**
26:17;38:5
**adding (1)**
66:3
**additional (3)**
18:25;19:4;24:19
**address (1)**
24:1
**administering (1)**

4:21
**AE (3)**
52:8,12;54:20
**aerial (1)**
40:20
**affects (1)**
46:9
**affiliation (1)**
13:17
**Affirmative (7)**
16:9;38:16,19;39:22;
45:5;49:20;59:23
**aforementioned (1)**
4:5
**after-built (1)**
11:22
**Again (4)**
48:11;49:3;61:23;
63:5
**against (1)**
42:2
**ago (1)**
50:17
**agree (24)**
11:1;22:13;34:4;
37:16;38:10,22;40:9;
45:19;46:8;47:19,25;
49:25;50:21;52:13;
54:12,19,22;55:3,18;
65:2,5;67:2,6;70:7
**AGREED (1)**
4:3
**ahead (6)**
10:7;17:16;29:10;
31:8;32:6;62:13
**Alabama (1)**
18:6
**alleviate (1)**
21:1
**Alligator (18)**
30:7,13;31:19,24;
32:24;33:6,7;40:25;
41:3,6;47:11,22;48:1,5,
22;56:9,10;64:9
**Almost (1)**
7:9
**along (3)**
50:13;63:22;64:6
**amend (1)**
19:7
**amended (1)**
58:24
**amount (2)**
56:25;57:16
**amounts (1)**
21:11
**analysis (3)**
25:17;60:3;71:16
**analyze (1)**
68:22
**and/or (1)**
55:15
**answered (2)**

55:25;70:4
**apologize (1)**
51:22
**appear (1)**
30:11
**appears (4)**
29:20,24;40:20;45:1
**applicable (3)**
36:17;52:14;53:1
**applied (1)**
68:13
**apply (2)**
71:8,8
**April (1)**
13:9
**Aqua (6)**
36:3;60:11;61:2;
65:14,17;68:7
**Aqua's (6)**
65:15,25;66:5,7,8,17
**architectural (3)**
25:5;61:23;62:6
**architecture (1)**
62:10
**area (3)**
20:24,25;40:24
**around (1)**
21:12
**articles (1)**
26:15
**as-built (2)**
12:16,24
**assigned (1)**
68:21
**Assum- (1)**
58:19
**assume (4)**
6:1;11:17;45:25;
65:17
**assumed (1)**
68:7
**assuming (4)**
48:19,19;49:21;
58:19
**assumption (1)**
59:6
**attached (2)**
7:1;63:20
**attachment (1)**
54:5
**attorney (1)**
63:5
**attribute (1)**
42:10
**Avenue (1)**
20:22
**aware (8)**
10:1;25:2;37:2;
39:11;43:21;52:6,9;
65:20

## B

**Bachelor's (1)**
19:20
**back (11)**
16:2,3;18:18;21:7;
24:15;28:10,12;47:22;
48:4,22;51:15
**backwards (1)**
15:19
**bank (8)**
47:9;48:1,12,13,20,
22;49:1,3
**banks (3)**
41:4;47:21;48:19
**barrier (2)**
47:3,4
**barriers (3)**
46:22;47:11;48:14
**base (1)**
12:20
**based (12)**
9:7;12:19;19:7;
34:17;38:11;40:13;
43:2,11;54:21;61:5;
63:4;68:25
**basin (5)**
39:1;45:14,15;53:5;
63:3
**basins (3)**
38:4,23;45:11
**basin's (1)**
38:14
**basis (1)**
46:7
**becoming (1)**
14:17
**began (1)**
13:24
**behalf (3)**
8:18,20;9:3
**behind (1)**
51:11
**below (3)**
33:19;37:17;48:2
**best (6)**
9:9;10:23;18:4;23:9;
25:22;64:11
**better (2)**
11:23;52:1
**bid (2)**
14:10,11
**big (2)**
21:10,11
**bigger (1)**
37:9
**bit (1)**
37:22
**BKI (2)**
16:7,14
**black (2)**
31:13;51:3
**both (2)**
48:19,19
**bottom (4)**

34:7;46:14,15;49:15
**Boundary (1)**
33:5
**boy (1)**
16:7
**Branch (20)**
30:7,13;31:19,24;
32:25;33:7,7;40:25;
41:3,7;47:11,22;48:1,5,
23;49:2;56:9,11,14;
64:9
**break (2)**
6:6;66:21
**brick (5)**
57:23,25;58:12,15,
16
**brim (1)**
58:20
**broken (1)**
29:25
**brought (1)**
62:12
**bucket (1)**
57:22;58:18,19
**build (1)**
54:25
**building (3)**
25:6;38:3;45:24
**buildings (1)**
40:19
**built (12)**
12:4,7,9,11;13:1,2;
39:12;44:4;45:25;52:7,
12,24
**bullet (1)**
59:20
**Butler's (6)**
27:10;58:22;70:3,8,
24;71:3

## C

**calculable (1)**
57:14
**calculate (3)**
56:13,17;57:1
**calculated (1)**
57:15
**calculation (1)**
57:3
**calculations (4)**
59:2,14;60:24;63:7
**call (2)**
14:2;30:6
**called (3)**
15:24;16:6;40:25
**came (2)**
32:21;45:11
**can (16)**
6:4;14:21;15:7;
20:16;23:8,10;29:19;
37:21;39:23;44:25;
45:25;47:14;51:10;

57:14;63:1,16
**Canal (2)**
21:14,15
**canals (1)**
21:12
**capacity (3)**
46:10,10;57:8
**case (9)**
5:11,17;10:22;11:14;
16:19;35:15,20;39:4,5
**catch (5)**
38:4,14,22;39:1;
45:15
**cause (2)**
26:25;48:22
**caveat (1)**
66:2
**certain (7)**
8:11;9:7;20:24;
38:23;54:10;55:2;
56:25
**certainly (3)**
28:5;33:17;66:1
**certificate (2)**
20:1;36:9
**certification (2)**
4:12;20:3
**Certified (1)**
4:19
**change (2)**
26:25;49:5
**changed (3)**
34:10;49:7;56:4
**changes (2)**
46:6;66:3
**channel (2)**
19:16;56:17
**check (1)**
31:1
**Chevron (4)**
22:2,21;23:14;52:23
**Chevron's (1)**
22:24
**CINDY (1)**
4:19
**circumstances (1)**
13:23
**City (9)**
14:25;15:12,12,13;
23:25;54:9,23;55:15;
59:22
**Civil (6)**
4:6;22:11,12,14;
25:10;60:17
**claims (2)**
42:9,17
**clarification (1)**
35:6
**clarify (2)**
8:24;39:8
**clearly (2)**
6:3;71:6
**client (2)**

68:4,4
**CM (1)**
4:19
**code (2)**
67:3,8
**coincidence (1)**
18:12
**collect (2)**
21:5,12
**collected (1)**
31:23
**color (2)**
51:20,24
**comfortable (1)**
36:15
**coming (4)**
45:13,20;59:7;60:6
**communications (1)**
24:16
**companies (1)**
13:17
**company (18)**
8:10,15,23;9:13,14,
16;11:7,8,11;14:16;
15:24;16:6;20:11;42:4;
60:11,21,23;61:1
**compensation (1)**
11:3
**compete (1)**
14:12
**competitors (2)**
14:7,8
**complaining (1)**
41:19
**complaints (4)**
42:2,3,5,21
**completed (1)**
46:3
**complex (1)**
49:6
**compliance (2)**
69:11;70:10
**complicated (1)**
14:15
**complied (2)**
54:14;55:4
**comply (3)**
64:24;65:3,5
**comprehensive (3)**
26:18,20,21
**conceptual (1)**
63:20
**concerned (1)**
18:2
**concluded (1)**
72:7
**conclusion (4)**
60:2;61:19;71:14,15
**conclusions (1)**
11:16
**concrete (5)**
46:21;47:3,11,21;
48:14

**conditions (2)**
12:16;39:11
**conduct (2)**
67:3,9
**configuration (2)**
37:15;43:11
**connected (1)**
45:12
**consideration (2)**
70:18;71:25
**construction (8)**
22:3;34:3;37:18;
42:25;44:5,5;52:15;
63:10
**consultant (1)**
8:17
**contacted (1)**
13:16
**contain (1)**
43:5
**contained (2)**
27:16,17
**content (1)**
11:2
**contract (6)**
25:10,11;60:17;61:4,
10,14
**contracted (1)**
20:23
**contractor (1)**
37:13
**contracts (4)**
25:19;67:18,21;69:9
**contradict (1)**
71:11
**contradicted (1)**
12:3
**contrary (1)**
59:13
**control (3)**
38:3;57:9,9
**conversation (1)**
14:4
**conversational-type (1)**
23:5
**convey (1)**
21:11
**coordinating (1)**
13:24
**copies (3)**
17:10,22;40:5
**copy (4)**
34:18,21,25;35:24
**corner (3)**
46:14,16;49:16
**correctly (1)**
24:2
**counsel (1)**
4:4
**County (2)**
54:10,24
**couple (3)**
17:7;27:5;67:15

**COUR (1)**
4:19
**course (2)**
8:1;19:17
**Court (4)**
4:20;5:3;10:9;29:7
**covenants (2)**
54:24;55:15
**Covington (3)**
23:23,25;24:1
**create (1)**
12:1
**culverts (5)**
56:20,25;57:8,12,17
**curious (2)**
19:24;34:24
**current (2)**
17:8;61:22

---

**D**

**daily (1)**
46:7
**damage (2)**
42:7;59:21
**damages (1)**
42:10
**dashed-type (1)**
31:11
**dashes (1)**
31:17
**data (3)**
34:15;36:16;39:15
**date (3)**
19:3;34:10,13,16,22
**dated (2)**
10:19;63:21
**dates (1)**
34:17
**day (2)**
26:8;45:1
**deal (2)**
48:11;60:9
**dealt (1)**
24:9
**December (1)**
62:3
**deep (1)**
45:23
**defines (1)**
68:5
**definitely (4)**
17:7;28:6;50:22;
57:11
**definitions (1)**
19:25
**degree (4)**
16:13;19:21;20:2;
40:8
**DEI (6)**
14:16,17;15:12,13,
22;16:16
**delineations (1)**

43:17
**depend (1)**
13:22
**depends (2)**
47:23;48:11
**deponent (1)**
8:16
**deposit (1)**
48:21
**deposited (1)**
46:4
**deposition (17)**
4:5,16;5:14;6:9;
10:15;24:13;25:24;
27:9,10,11,12;43:14;
54:6;58:24;69:3,9;72:6
**depositions (3)**
6:21;24:20;27:6
**depth (2)**
27:9;56:12
**describing (1)**
39:23
**design (22)**
9:24;10:18;11:5,6;
12:18,19;15:2;20:25;
21:4,5;44:7;60:3,14;
61:7,11;63:2,8,17;
64:22;70:9,19;71:16
**designation (1)**
32:21
**designed (12)**
11:24,25;12:5,6,9;
13:2,3;20:8;21:22;
22:7;24:3,8
**designing (1)**
65:23
**detail (1)**
11:18
**details (1)**
11:18
**detention (19)**
11:22;21:19,22;
22:19;25:4,20;38:11,
18,25;45:11,14;53:5;
59:2,6,8;61:7,11;63:3,8
**determine (3)**
20:24;22:23;60:18;
61:3
**determined (1)**
68:4
**develop (1)**
26:22
**developed (5)**
21:19;22:19;24:18;
43:4;44:2
**developing (1)**
23:13
**development (4)**
39:18;54:12,14;
55:17
**difference (2)**
47:7,9
**different (6)**

12:7;22:14;24:16,17;
36:4;57:3
**difficult (1)**
30:8
**dimension (1)**
56:25
**dimensions (3)**
46:1;56:11,17
**directions (1)**
38:9
**dirt (15)**
37:19,23;38:5;43:21,
25;44:8;47:10;48:3,21;
54:11,15;55:1;60:15;
64:22;70:20
**discharge (2)**
45:8;53:8
**disclosed (2)**
27:5;54:5
**disclosure (2)**
12:25;27:13
**disclosures (1)**
19:4
**discussion (5)**
18:15;23:5;43:14;
52:3;53:22
**displace (2)**
58:14,15
**distinction (1)**
22:24
**ditch (2)**
63:22;64:6
**document (13)**
8:2;16:24;25:9;30:4,
14,16,19;31:6;33:11;
37:8;39:21;71:21,23
**documentation (3)**
52:10;66:13;69:2
**documents (9)**
7:16;25:5,6;26:15;
31:21;37:9;43:2;44:22;
68:11
**Dominion (1)**
20:1
**Don (1)**
29:2
**done (4)**
34:2;36:1;55:16,17
**Don's (1)**
40:4
**double (1)**
31:12
**down (1)**
56:9
**downstream (1)**
39:3
**dozen (1)**
15:2
**Dr (6)**
27:10;44:15;49:14;
53:25;66:24;67:17
**drainage (26)**
9:24;20:9,22;21:10;

22:8;23:16;25:17;
32:19,22;33:6;38:4,11,
12;53:7,15,18;59:7,11;
60:7;61:7,11;63:7,18;
64:2,15,20
**draining (1)**
45:9
**drawing (2)**
12:24;34:10
**drawings (5)**
38:5;39:5;43:8,24,25
**drive (7)**
7:11,18;17:18,19;
21:3;24:24;56:20
**duly (1)**
5:2
**Duncan (1)**
21:15
**during (5)**
8:1;16:14;25:24;
34:21;42:20
**duties (1)**
14:25
**duty (1)**
62:15

---

**E**

**earlier (3)**
19:12;52:22;56:8
**early (1)**
13:20
**Earth (1)**
39:24
**easement (3)**
32:19,22;33:6
**easy (1)**
14:1
**edge (2)**
63:22;64:7
**either (5)**
5:19;11:11;23:5;
33:10;69:8
**electronic (4)**
27:18,23;28:3,6
**elevated (1)**
38:23
**elevation (4)**
38:3;44:9;47:7,9
**elevations (4)**
30:5;37:10,11,12
**else (5)**
35:19;36:1;40:14;
48:24,25
**employed (2)**
11:11;15:11
**employees (1)**
26:2
**employer (3)**
15:14;16:4,6
**employers (1)**
15:20
**encompassing (1)**

27:21
**end (1)**
13:18
**engineer (17)**
5:24;35:21;44:3,4,
10;64:19,24;65:3,5,9,9,
11,13,21;67:7,25;68:20
**Engineering (17)**
10:18;11:5,6;14:11;
22:11,12,14;25:10;
36:1,3,16;54:10;55:2;
60:9,17;63:10;64:21
**engineers (2)**
15:2;67:4
**enough (4)**
18:12;36:19;49:3;
57:12
**entered (1)**
67:18
**equal (6)**
12:1;48:20,24,25;
58:14,16
**equation (1)**
49:6
**Esplanade (1)**
21:14
**estimate (1)**
14:25
**evaluate (1)**
60:13
**evaluation (4)**
62:20;71:17,20,25
**even (3)**
51:1,9,14
**eventually (2)**
35:24;45:12
**everyone (1)**
17:1
**evidence (2)**
4:17;69:9
**exact (2)**
30:19;44:21
**exactly (8)**
8:21;13:2;25:12;
31:2;46:2;49:4;50:18;
71:1
**EXAMINATION (31)**
5:5;6:24;8:25;9:15;
10:13;17:9;23;18:19;
29:16;32:10;35:12;
37:6;41:16;43:16;
44:14;47:17;48:17;
49:13;50:10;52:5,21;
53:24;55:11;56:2;
61:17;62:25;63:25;
65:12;66:23;67:16;
70:1
**example (1)**
59:19
**examples (1)**
14:22
**exception (1)**
12:23

**excused (1)**
72:8
**Exhibit (11)**
6:8;8:2;10:8,15;
28:21;29:4,11,18;
44:16;46:15;49:15
**exhibits (3)**
6:20;27:11;53:25
**exist (1)**
42:18
**existed (2)**
43:18;61:4
**existing (1)**
22:3,5;63:22;64:6
**exists (3)**
36:18,19;42:13
**expansion (1)**
22:5
**experience (1)**
52:23
**experienced (1)**
42:21
**expert (7)**
5:18;8:7,14,18;9:4,
17,21,23;13:16,21;62:9
**expertise (1)**
63:6
**explain (2)**
8:3;37:11
**extra (1)**
17:22

---

**F**

**facility (15)**
9:25;13:6;21:23;
22:1,6,24;23:24;26:13;
29:21;34:20;52:7;53:5;
59:7,11;60:25
**fact (2)**
42:12;59:16
**familiar (5)**
13:13;40:6;42:23;
46:18;56:19
**familiarity (1)**
56:23
**far (3)**
17:25;56:11;63:23
**fast (1)**
63:12
**Federal (1)**
4:6
**feel (4)**
6:4;30:17;36:15,17
**feet (3)**
43:25;48:2,3
**fence (6)**
49:18;50:1,3,9,14,19
**field (2)**
34:13,15
**figure (1)**
57:14
**file (6)**

27:18,23;28:3,6;
35:7;66:15
**files (1)**
36:4
**filing (1)**
4:12
**fill (15)**
37:19,23;38:5;43:21,
25;44:8;47:10;48:3,21;
54:11,15;55:1;60:15;
64:22;70:20
**filled (2)**
57:24;58:20
**final (5)**
10:21;16:13;37:15;
43:11;44:9
**find (3)**
8:21;10:2;40:2
**finish (2)**
23:8,11
**finished (1)**
21:2;37:17;38:3
**firm (1)**
60:9
**first (4)**
5:2;16:6;59:20;64:5
**five-acre (1)**
63:19
**five-gallon (2)**
57:22;58:18
**five-minute (1)**
66:21
**flat (9)**
39:9;40:11,13;41:5
**flood (22)**
21:7;22:20,22;24:10;
49:2;52:8,13,14,24,25;
53:15,19;54:16,20,25;
55:17;59:21;60:15;
64:23;70:10,20,21
**flooding (2)**
20:25;42:8
**floodplain (11)**
40:25;41:6;59:25;
60:10;62:20;65:21;
67:22;68:8,22;69:11;
70:19
**flow (5)**
38:20,21;53:9;56:13;
57:16
**flowed (1)**
41:1
**flows (1)**
19:17
**follow (2)**
60:18;67:8
**followed (2)**
55:10,19
**follows (1)**
5:4
**form (10)**
4:14;47:13;48:7,9;
50:6;52:17;55:6,21,23;

71:11
**formalities (2)**
4:9,11
**found (1)**
39:20
**four (3)**
21:16;29:20,25
**Frisco (1)**
20:22
**front (1)**
63:4
**full (1)**
5:7

## G

**gave (1)**
19:11
**GEC (2)**
15:24;16:1
**general (6)**
22:14;25:10;42:12;
48:18;55:9,13
**gentleman (1)**
46:24
**geotechnical (1)**
63:9
**given (3)**
18:25;19:8;35:24
**giving (2)**
9:17,23
**gonna (20)**
5:12;9:21;11:20;
14:1;23:3,3,4,6,7;30:6;
31:9;40:4,4;45:17;
54:24;55:1;57:21,25;
64:13,14
**good (6)**
36:19;45:17;50:25;
51:4,20,24
**Google (1)**
39:24
**governed (1)**
53:6
**grading (5)**
25:15;30:23,25;37:7,
8
**graduate (1)**
16:12
**graduated (1)**
18:5
**graduating (1)**
16:10
**grassy (1)**
51:11
**gravity (8)**
38:20,21,24;57:23;
58:3,9,11,13
**gravity's (1)**
58:5
**great (2)**
27:9;48:11
**greater (2)**

11:18;53:10
**GREGORY (5)**
48:8;50:5;52:16;
55:22;69:22
**ground (6)**
40:21;50:1,2,8,14;
51:15
**guess (5)**
9:9;16:1;51:5;59:19;
61:2,13
**guys (2)**
47:2,3

## H

**ha- (1)**
57:24
**halfway (1)**
58:7
**hand (1)**
33:15
**handed (3)**
10:14;49:14;54:2
**happen (7)**
23:4;47:24;48:15,16;
49:4;57:25;58:8
**happening (1)**
50:18
**hazard (8)**
22:20;54:16,20,25;
55:18;60:15;64:23;
70:21
**head (2)**
20:20;57:10
**heading (1)**
22:15
**held (4)**
18:15;43:15;52:3;
53:22
**help (2)**
8:3;33:10
**helped (2)**
26:3;35:21
**hereby (2)**
4:5,15
**hereto (1)**
4:4
**hesitate (1)**
6:6
**higher (8)**
39:2,8;49:1;50:2,14,
20,22;51:12
**hired (8)**
9:20,23;15:12,14;
25:3,15,19;60:21
**hit (1)**
47:21
**hold (6)**
23:11;31:9;32:11,12;
46:25;56:18
**holding (3)**
45:4;46:10;49:17
**horizontal (1)**

33:21
**Hunter (3)**
8:7;9:1,20
**hydraulically (1)**
57:13
**hydraulics (4)**
19:17,18;56:15;63:6
**hydrologist (3)**
5:24;47:20;56:12
**hydrology (2)**
19:18;56:16

## I

**ie (1)**
65:14
**imagine (1)**
46:6
**immediate (1)**
34:23
**immediately (2)**
20:19;21:17
**impair (1)**
7:21
**implied (1)**
71:22
**impression (1)**
60:20
**improvements (1)**
20:25
**inaccurate (1)**
70:15
**Inc (2)**
11:5,6
**include (3)**
63:7,18;64:1
**included (2)**
12:25;64:13
**increased (1)**
42:8
**independent (2)**
42:16;68:16
**independently (1)**
8:17
**indicate (3)**
34:9,11;40:24
**indicated (1)**
41:4
**indicates (2)**
31:19;32:24
**indigo (1)**
16:8
**industrial (3)**
22:8;33:5,8
**influence (1)**
49:2
**information (7)**
7:18;19:1,8;24:17;
37:13;43:7;49:3
**initial (1)**
14:4
**inlet (1)**
57:9

**inside (4)**
30:6,12;31:23;33:7
**intend (2)**
11:14;19:6
**intended (2)**
44:3,10
**interested (1)**
13:21
**intermittently (1)**
16:14
**internal (1)**
9:24
**interruption (1)**
43:14
**intimately (1)**
20:12
**into (14)**
21:7;23:4;29:25;
43:4;45:9,13;47:22;
48:4,22;54:7;60:6;
67:18;70:18;71:25
**invert (2)**
39:1,2
**investigate (1)**
38:8
**investigation (2)**
52:11,20
**involved (3)**
20:12,13;21:9
**involves (2)**
57:9,10
**issue (4)**
21:1;60:10,13;61:3
**issues (3)**
42:8;62:20;63:8

## J

**JAMES (2)**
5:1,8
**January (1)**
62:3
**Jefferson (1)**
20:23
**Jill (1)**
58:22
**jobs (1)**
14:10
**JR (2)**
5:1,8
**June (1)**
10:19
**Junius (6)**
8:7;9:1,20;26:10;
35:19;69:3
**Junius' (1)**
27:12

## K

**kangaroo (1)**
16:7
**keep (1)**

23:8
**Kenner (3)**
15:12,12,14
**Kenner's (1)**
15:1
**knew (2)**
56:10,16
**knowledge (6)**
18:4;32:23;42:17;
64:11;66:11;68:17
**known (1)**
19:10

## L

**LA (1)**
4:19
**lack (2)**
11:23;14:1
**laid (1)**
71:5
**Lake (1)**
21:7
**Lakeshore (1)**
21:3
**land (4)**
40:11;41:5,5;51:11
**larger (2)**
30:2,16
**Larry (1)**
28:1
**last (13)**
11:2;13:9;14:21;
15:19,20;20:8;21:2,18,
23;22:7,18;27:15;
66:14
**lately (1)**
16:21
**later (1)**
34:22
**law (2)**
4:8;55:10
**least (1)**
30:21
**LEED (1)**
63:8
**left (6)**
33:4;47:2;49:19;
50:2,8,23
**left-hand (3)**
31:6,10;32:18
**legally (1)**
19:13,14
**length (3)**
31:14;56:10,16
**less (5)**
12:1;53:10;57:23;
58:5,9
**level (3)**
37:17;49:25;50:2
**LH- (1)**
15:6
**LHJ (17)**

14:2,4;15:6;25:2;
28:14;35:7;41:21;42:2;
46:13,15;49:16;60:3;
67:18,21;70:8,17;
71:16
**LHJ's (2)**
14:23;41:23
**licensed (1)**
66:24
**limited (2)**
63:2;65:18
**limits (1)**
23:25
**line (5)**
31:11,12,17;33:21;
39:14
**Linfield (13)**
8:7;9:1,2,20;12:19;
13:20;15:3;26:7;60:12,
14;62:14;69:10;70:17
**Linfield's (3)**
9:8;60:13;61:6
**list (2)**
26:18,18
**listed (3)**
18:22;20:1;26:15
**little (4)**
24:2;31:12;37:21;
63:12
**local (5)**
23:15;52:13;64:24;
65:3,6
**located (1)**
40:10
**location (1)**
37:14
**logo (1)**
10:18
**long (1)**
54:17
**look (14)**
6:7;25:7;17:22;23;
33:19;38:6,7;40:7;
46:18;51:2;59:1,3;
62:8,13
**looked (5)**
16:20;39:5;56:7;
66:7;67:17
**looking (6)**
27:2;33:19;38:7;
39:24;50:11;63:24
**looks (1)**
31:23
**lot (8)**
36:3;40:15,18,22;
45:20;47:23;58:25;
66:13
**Louisiana (1)**
4:21
**lower (1)**
51:12

## M

**mailing (1)**
24:1
**making (2)**
34:16;42:18
**man (2)**
47:3;48:2
**manager (2)**
15:1,15
**man's (1)**
47:8
**many (4)**
13:10;15:1;19:4;
27:4
**March (2)**
62:2,4
**mark (4)**
10:7;32:6;51:1,9
**marked (4)**
10:15;29:17;44:16;
49:15
**MARTIN (11)**
5:1,8,9;7:20;10:16;
29:17;44:15;49:14;
53:25;66:24;67:17
**massive (1)**
21:11
**Master's (1)**
20:2
**materials (2)**
9:7,8
**matter (1)**
53:14
**may (8)**
4:16;11:17,18;31:7;
39:21;61:25;68:13;
70:12
**maybe (1)**
54:5
**mean (7)**
24:10;37:12;51:14;
58:2;59:6;61:2;71:20
**meaning (1)**
48:25
**means (1)**
33:25
**meant (2)**
9:13,16
**measurement (1)**
46:2
**measurements (2)**
30:12;56:9
**medications (1)**
7:21
**medicines (1)**
7:24
**meets (1)**
11:22
**member (2)**
14:17;26:7
**memorized (1)**

69:6
**memory (2)**
22:21;25:22
**mentioned (1)**
8:23;60:10
**Metairie (1)**
20:23
**middle (1)**
10:18
**military (1)**
20:6
**mind (3)**
17:13;21:17;23:1
**minute (1)**
28:10
**Miss (5)**
27:10;70:3,8,24;71:3
**missing (1)**
16:23
**Mississippi (3)**
22:9;66:25;67:8
**mistaken (1)**
59:18
**misunderstood (1)**
9:12
**months (3)**
24:14;50:16,17
**more (17)**
15:2;16:3;17:6;
20:15,20,20;24:21;
25:3;26:24;31:1;53:12;
56:15;58:3,4,11;67:12;
69:17
**morning (1)**
6:21
**most (3)**
17:7,24;61:22
**mounds (2)**
49:18;50:22
**move (2)**
6:13;21:10
**moved (1)**
38:8
**moving (1)**
57:7
**much (8)**
40:10;46:4;47:10;
52:1;53:12,15;57:1;
62:9
**multiphase (2)**
19:17;21:3

## N

**name (3)**
5:7,9;21:25
**named (1)**
41:23
**names (1)**
19:11
**Nathan (2)**
26:10;69:3
**natural (4)**

37:17,19;47:9;48:1
**nature (4)**
16:15;19:18;39:13;
40:19
**near (1)**
57:11
**need (9)**
6:5,12,12;8:3;10:2;
26:17;37:20;54:13;
55:12
**needed (3)**
36:24;38:7;43:24
**needs (1)**
54:15
**NEGROTTO (52)**
5:5,10;6:11,22,24;
8:19,25;9:15;10:6,11,
13;17:9,23;18:17,19;
28:22;29:1,9,14,16;
32:5,10;35:8,12;37:6;
41:14,16;43:16;44:14;
47:17;48:17;49:11,13;
50:10;51:25;52:5,21;
53:24;55:11;56:2;
61:17;62:21,25;63:25;
65:12;66:19,23;67:11;
69:16,20;70:1;72:2
**new (4)**
17:20;19:7;22:4,5
**next (1)**
46:12
**nicknames (1)**
19:14
**NOLETTO (36)**
6:14,19;8:13;9:5;
13:16,24;16:25;17:3,
15,21;18:7,9,13;25:25;
26:4;28:19,24;29:5;
35:5,10,20;44:12;
47:12;48:6;51:23;55:5,
20;61:15;62:11,18;
63:11;65:8;67:14,16;
69:14;72:4
**Norfolk (1)**
63:21
**no-rise (1)**
36:9
**north (2)**
21:23;32:15
**northbound (1)**
31:9
**Northpark (4)**
22:2,24;23:15;53:5
**notes (2)**
24:15;27:2
**notice (1)**
6:8
**nowhere (1)**
25:18
**number (3)**
29:6;56:24;58:13
**numbered (1)**
10:25

**numbers (2)**
30:5;9;31:5,22
**numerous (2)**
22:15;34:25

## O

**oath (1)**
4:22
**Object (8)**
47:13;48:7;9;50:6;
52:17;55:6,21,23
**objections (2)**
4:13;71:3
**obligation (1)**
60:17
**observing (1)**
44:5
**obstructions (1)**
59:25
**Obviously (3)**
5:12;19:13;45:20
**oddly (1)**
18:12
**Off (7)**
18:14,16;22:21;
23:11;43:15;52:3;
53:22
**offhand (1)**
27:2
**office (2)**
26:3;35:21
**officiated (1)**
4:21
**offsite (4)**
54:11,15;55:1;70:20
**old (4)**
17:7,19;20:1,23
**once (1)**
13:12
**one (52)**
10:1,2;12:23;13:20;
15:3,6;16:3;19:11;
20:11,14,15,21;21:13,
14,20;22:25;24:3;
25:12;26:2,7;27:8;28:5;
28:17;30:1,2,2,23;
31:1;32:7,11,12;33:15;
34:22;43:8;44:18;
45:14;46:12,14,18,19,
19;47:3;48:21,25;49:6;
51:21;61:21;62:2,4,5;
68:17;69:17
**ones (2)**
20:13;27:7;46:18,20
**one's (1)**
21:1
**ongoing (1)**
20:14
**only (14)**
12:9;13:12;15:7,9;
22:25;28:17;34:6;44:6;
45:12,14,25;59:1;

61:11;68:13
**onto (1)**
  20:20
**oops (1)**
  31:7
**open (3)**
  19:16;21:21;40:21
**openings (1)**
  48:14
**opinion (20)**
  9:21;10:22;11:20,21;
  12:20;24:15;26:22,25;
  36:17;43:12;55:14;
  59:12,13,17;70:3,8,12,
  24,25;71:8
**opinions (4)**
  11:13;42:19;71:4,11
**order (4)**
  23:8;24:12;26:22;
  44:8
**ordinance (14)**
  52:14,25;53:16;
  54:23;59:21;60:19;
  64:21;65:4;67:22;68:8,
  22;69:11;70:10,19
**ordinances (12)**
  23:15,16;24:10;53:7,
  15;54:9,13;55:3,15,18;
  64:25;65:6
**orientation (3)**
  32:12,13;33:1
**original (2)**
  16:23;58:23
**originally (1)**
  12:4
**Orleans (1)**
  4:20
**others (1)**
  24:21
**out (10)**
  6:13;8:21;20:20;
  21:7;36:23,25;58:17;
  59:9;60:6;71:5
**outlet (1)**
  57:9
**output (1)**
  11:23
**over (4)**
  41:3;47:20;48:20;
  67:17
**overall (1)**
  43:3
**overflow (1)**
  58:17
**own (1)**
  11:11

## P

**page (6)**
  11:2;30:3;33:1;56:6;
  59:19,20
**pages (4)**

10:25;11:1;29:20,25
**paper (3)**
  30:21;34:20;44:6
**parameters (1)**
  59:3
**Parish (7)**
  4:20;20:23;23:20,22;
  24:6,9;53:7
**Park (2)**
  33:5,8
**part (20)**
  4:16;11:9;17:4;
  20:22;21:5;25:16;35:7;
  37:9;52:10,19;60:13,
  16;62:19;65:14;68:8;
  69:10;71:9,17,20,22
**particular (1)**
  27:7,24
**parties (2)**
  4:4;19:5
**pass (2)**
  21:6;57:1
**peak (1)**
  53:9
**Pearl (1)**
  59:22
**people (6)**
  11:10;24:20;26:12;
  35:14,17;47:1
**perform (2)**
  18:21;55:2
**performed (1)**
  54:11;60:3;71:16
**performing (3)**
  14:25;15:2;21:4
**period (1)**
  66:14
**permitting (1)**
  63:9
**personnel (1)**
  44:5
**pertain (3)**
  60:2;71:14,15
**phase (1)**
  63:10
**PhD (2)**
  5:1;19:15
**photograph (1)**
  51:19
**photographs (1)**
  35:2
**photography (1)**
  40:21
**Picayune (2)**
  33:4;59:22
**picture (13)**
  39:24;40:13;44:21;
  46:12;49:17,22;50:12,
  12,18,25;51:3,4;52:1
**pictures (1)**
  44:19
**pipes (5)**
  45:3,6,8,11,13

**placed (2)**
  48:4;64:23
**placement (2)**
  59:24;60:15
**plaintiffs (3)**
  5:10;41:18,22
**plaintiff's (1)**
  27:8
**plan (8)**
  23:14;25:15;30:24,
  25;37:7,8;63:20;71:10
**plans (4)**
  27:13;38:1;44:2;
  46:1
**plant (14)**
  21:20;22:9;35:17;
  39:12;40:10;41:5;
  42:24;43:4,18;52:6,7,
  23;65:23;68:23
**please (8)**
  5:6,25;6:5;8:3;9:18;
  10:2;28:8;61:18
**plus (1)**
  24:14
**pm (1)**
  72:7
**POB (2)**
  33:19,22
**point (4)**
  13:19,23;38:24;
  59:20
**pond (14)**
  33:20;38:11,18,25;
  45:1,9,13,23;46:5,10;
  59:2,6,8,14
**Pontchartrain (1)**
  21:7
**pop (1)**
  20:19
**portion (1)**
  43:4
**portions (1)**
  58:24
**position (1)**
  15:10
**positions (2)**
  14:18,19
**positive (2)**
  30:3;61:5
**possible (4)**
  39:9,17;49:24;66:16
**post-construction (3)**
  28:1;32:2,4
**post-storm (1)**
  12:1
**practices (1)**
  67:7
**pre-construction (1)**
  28:13
**preparation (1)**
  25:24
**prepare (2)**
  24:13;26:3

**prepared (2)**
  28:1,13
**prescribed (1)**
  11:23
**present (1)**
  35:18
**president (1)**
  11:7
**pre-storm (1)**
  12:2
**pretty (1)**
  40:10
**prevention (1)**
  59:21
**previous (2)**
  15:14;46:14
**principals (1)**
  13:20
**printed (1)**
  27:21
**prior (16)**
  6:20;7:8,9;13:19;
  14:3,17;15:22;19:20;
  24:17;34:2,12;39:10,
  18,19;42:24;43:18
**Probably (1)**
  28:23
**Procedure (1)**
  4:7
**produce (1)**
  7:5
**produced (5)**
  7:8,9;44:22;49:22;
  66:13
**production (2)**
  7:14;49:23
**professional (3)**
  67:3,9,25
**program (3)**
  15:1,3,15
**prohibit (1)**
  59:24
**project (2)**
  14:14;21:4
**projects (3)**
  14:16;21:9,10
**properties (1)**
  63:19
**property (6)**
  31:14,15;42:24;43:3;
  63:23;64:7
**proposed (1)**
  63:19
**provide (5)**
  6:4;12:15;25:3;
  55:16;60:21
**provided (17)**
  10:22;12:19,24;
  16:18,25;17:1;24:19,
  24;32:3;33:12;34:22,
  25;36:7,24;43:9;68:11;
  71:4
**provides (2)**

37:9,13
**providing (2)**
  13:21;64:20
**pull (1)**
  38:24
**pulling (1)**
  39:15
**pumped (1)**
  38:20
**purposes (1)**
  4:7
**push (3)**
  47:22;48:4,22
**put (11)**
  37:19,23;43:21;44:8;
  46:22;47:10;54:11,15;
  57:23,25;70:20
**putting (1)**
  9:9

## R

**RAFFERTY (2)**
  10:4;28:12
**rail (3)**
  27:14;60:24;65:18
**Railroad (1)**
  63:21
**rainwater (1)**
  38:15
**rates (1)**
  11:2
**Ravenwood (1)**
  56:20
**read (15)**
  6:10;11:21;24:18;
  27:9;30:8,9;42:3,6;
  54:21;58:22,22,23;
  63:12;70:2,4
**reading (5)**
  4:9;24:21;58:25;
  68:10;71:21
**ready (2)**
  8:21;23:7
**really (6)**
  26:14;42:15;44:6;
  50:25;51:4;56:15
**reason (4)**
  6:4;33:3;51:6;70:14
**reasonable (3)**
  52:20;54:13;55:3
**recall (11)**
  15:8;22:21;24:1;
  27:1;39:14;42:9,12;
  44:20;54:6;70:12,13
**received (3)**
  27:6,15;36:8
**receiving (1)**
  39:3
**recent (1)**
  17:24
**recently (4)**
  16:22;27:12,13;36:7

**recess (1)**
66:22
**recognize (1)**
44:18
**recollection (3)**
10:23;25:1;43:19
**record (6)**
18:14,16,18;43:15;
52:4;53:23
**records (1)**
22:23
**reference (2)**
23:19;36:2
**referring (1)**
8:15
**reflected (2)**
11:14,16
**regard (17)**
12:11;15:20;16:18;
18:20;19:1;30:6;39:12;
41:18,21;55:17;59:2,5,
7,14;60:5;67:3;71:25
**regarding (2)**
25:5,7
**regardless (1)**
64:12
**related (1)**
67:22
**relates (2)**
9:8;68:22
**relationship (3)**
13:25;14:3,6
**relative (1)**
58:12
**remember (8)**
21:25;25:12;26:9;
34:22;42:15;50:17;
51:3;53:19
**repeat (1)**
70:22
**report (15)**
10:3;11:15,17,21;
18:20,23;19:2,7;26:16;
58:22,23,24;59:3;71:4,
13
**Reporter (4)**
4:20;5:3;10:9;29:7
**represent (1)**
5:10
**representations (1)**
68:12
**reproduction (2)**
51:11;52:2
**require (2)**
54:10;55:1
**required (4)**
44:1;46:1;60:14;
70:19
**requires (2)**
64:21,22
**research (2)**
19:16;40:23
**researched (1)**

39:17
**reserved (1)**
4:15
**respect (1)**
30:4
**response (10)**
16:9;38:16,19;39:22;
45:5;49:20;59:17,23;
60:1;71:5
**responsibility (6)**
65:23,25;66:1,6;
70:9,18
**responsiveness (1)**
4:14
**restricted (1)**
59:10
**result (1)**
7:12
**résumé (4)**
16:18,20;28:20;29:4
**retained (2)**
8:17;9:6;60:9
**retention (1)**
33:19
**review (5)**
9:6;12:16;23:15;
59:10;69:2
**reviewed (18)**
7:2;9:8;24:25;26:16,
19,21,22;27:3,25;
28:13;29:23;36:16;
38:1;41:17;66:15;69:1,
4,5
**right (30)**
10:5;16:3;18:8;
20:11;21:1,15;25:8;
27:1;33:4;34:7;36:5,
12;38:8;45:7;46:22;
47:4,8;48:2;49:15,18;
50:1,22;51:8;58:3,7,
21;64:10,17;68:3,25
**right-hand (3)**
33:22;46:14,16
**River (1)**
59:22
**Road (1)**
32:15
**Robert (1)**
5:8
**ROGERS (1)**
4:19
**Roughly (1)**
13:9
**row (1)**
50:13
**rule (1)**
53:11
**Rules (3)**
4:6;53:8;55:19
**running (1)**
50:13
**runoff (2)**
12:1,2

**runs (1)**
31:14

---

**S**

---

**same (9)**
14:10,12;17:10;
32:11,13;39:8;50:20;
53:10;56:6
**sand (10)**
21:20;45:21,24;46:4,
9;49:18;50:13,22;
51:12;52:6
**save (1)**
4:13
**saw (11)**
25:5,6;27:8,10,10,
11;28:17;31:5;34:20;
56:21,22
**saying (3)**
44:7;64:18;66:5
**Schedule (1)**
6:25
**school (2)**
19:25;20:4
**schools (1)**
19:20
**scope (19)**
9:9,19,22;25:13;
60:13;61:6,23,24;
62:20;63:24;65:15;
66:9,10,17;67:21;68:4,
8;69:10;71:9
**sealing (1)**
4:11
**second (2)**
10:1,2;34:3
**second-to-last (2)**
27:25;59:19
**seem (3)**
33:2;34:14;40:13
**seemed (1)**
40:17
**seems (2)**
49:24;52:20
**sense (4)**
5:23,25;20:4;31:12
**sentence (1)**
64:5
**separate (1)**
60:9
**series (3)**
5:13,21;45:10
**served (1)**
41:6
**service (1)**
60:22
**services (9)**
14:11;15:3;18:22;
21:4;25:6,7,13;63:7,10
**set (2)**
34:3;37:9
**several (2)**

17:10;26:12
**sewer (1)**
15:1
**shape (1)**
71:11
**shore (1)**
21:23
**short (1)**
66:14
**show (3)**
40:24;53:9;63:1
**shown (1)**
63:20
**shows (2)**
39:25;67:21
**side (13)**
31:6,11,13;32:18;
33:22;47:2,4;48:3,25;
50:1,3,9,19
**sides (1)**
48:19
**signing (1)**
4:10
**silt (6)**
49:18;50:1,3,9,14,19
**similar (3)**
21:19,21;53:11
**simple (1)**
57:8
**simplest (1)**
20:21
**simplify (1)**
37:21
**simply (2)**
60:5,23
**sink (2)**
58:12,13
**sinkholes (1)**
42:8
**sit (1)**
68:19
**site (23)**
12:13;13:11,19;26:5,
6;35:3;37:10,14,24;
39:10,11,25;40:10;
42:13;43:22;45:9,9;
59:11;63:10;65:14,22;
68:14,23
**situation (1)**
13:23
**six (4)**
11:1;24:14;50:16,16
**Skip (1)**
5:9
**slope (1)**
40:12
**slowly (1)**
71:14
**Smith (1)**
28:1
**solely (1)**
25:20
**someone's (2)**

54:6;66:1
**sometimes (1)**
21:8
**somewhat (1)**
40:21
**sorry (10)**
10:12;15:25;37:5;
45:15;51:7,19,21;
63:15;69:21;71:15
**sought (2)**
4:17;36:23
**source (1)**
12:20
**south (1)**
23:24
**Southern (1)**
63:21
**speak (3)**
6:3;25:23;26:5
**special (8)**
22:20;54:16,20,25;
55:17;60:15;64:23;
70:21
**specific (8)**
42:2,4;57:22;58:2,5,
8,11,13
**specifically (5)**
4:10,12;25:20;41:23;
71:19
**specifics (1)**
54:8
**speed (1)**
58:14
**spent (1)**
24:21
**spokesperson (1)**
8:10
**spur (4)**
27:14;60:24;65:18;
68:14
**St (7)**
23:20;24:9;52:25;
53:6,7,11,12
**stand (1)**
71:12
**standing (5)**
46:24;47:1,4,8;48:2;
51:12,13
**start (2)**
23:6,10
**started (2)**
39:15;45:24
**State (5)**
4:21;5:6;67:4,7;
71:19
**stated (1)**
59:17
**statement (2)**
12:4;60:1
**STIPULATED (1)**
4:3
**storm (15)**
11:22;20:9;21:6,8,

Jeffery Chad Palmer, et al v.
Sun Coast Contracting Services, LLC, et al

James R. Martin, Jr., Ph.D.
January 16, 2017

12,19,22;22:8,19;
23:16;24:10;25:3,20;
45:20;60:6
**straight (1)**
23:9
**strictest (1)**
20:4
**strictly (2)**
63:2;65:18
**strike (2)**
13:14;66:17
**stringent (1)**
53:12
**Structural (1)**
42:7
**structure (1)**
39:3
**study (2)**
20:24;69:10
**stuff (3)**
24:19;26:24;27:20
**subheadings (1)**
22:17
**subsequent (1)**
19:23
**subsidence (1)**
42:8
**subsurface (4)**
63:18;64:2,15,20
**suggested (1)**
44:1
**summers (1)**
16:14
**supervision (3)**
14:18,19,23
**supplement (1)**
19:7
**supplied (1)**
16:24
**supposed (1)**
33:14
**supposedly (1)**
65:21
**supposition (1)**
34:16
**sure (9)**
8:4;15:18;20:18;
28:8;39:22;56:5;64:18;
69:7;70:9
**surface (4)**
63:18;64:2,14,20
**survey (16)**
21:2;25:7;28:1,13,
16;29:21,22;32:2,4;
33:13;34:12,13;35:24;
38:2;56:8;61:24
**surveys (1)**
34:25
**sworn (1)**
5:2
**SWPPP (1)**
63:9
**system (13)**

9:25;11:22;20:9;
21:19,22;22:8,19;24:8;
25:4,21;60:7;61:7,12
**systems (1)**
21:8

---

**T**

---

**ta- (1)**
62:14
**tail (1)**
57:10
**talk (2)**
15:16;20:21
**talked (3)**
35:13,19;52:22
**talking (4)**
31:17;57:4;67:23;
70:23
**talks (1)**
59:20
**Tammany (7)**
23:20;24:9;52:25;
53:6,7,11,12
**task (1)**
64:19
**tasked (3)**
61:3,11;62:14
**technical (3)**
19:20,25;20:4
**telling (1)**
60:16
**ten (2)**
15:20;16:2
**term (3)**
11:23;21:21;38:12
**terminal (1)**
16:13
**terms (2)**
45:18;69:1
**terrible (1)**
51:19
**testified (1)**
5:18
**testify (4)**
5:3;8:17;9:7;12:10
**testimony (3)**
9:17,23;13:22
**testing (2)**
63:8,9
**Thanks (1)**
69:15
**theory (1)**
48:18
**thereof (1)**
4:16
**therewith (1)**
69:12
**thinking (1)**
30:23
**third (1)**
25:9
**thought (3)**

9:13;30:22;55:25
**three (5)**
47:2,3;62:1;67:18,20
**throughout (1)**
36:3
**thumb (5)**
7:11,18;17:18,19;
24:24
**till (1)**
23:11
**times (1)**
13:10
**today (15)**
7:3,8,10,21,22;8:6;
9:17;12:10;17:2;19:12;
24:13;25:24;68:13,15,
19
**together (2)**
14:13;39:15
**told (1)**
45:17
**took (10)**
34:14;35:2;44:19,20;
46:18,20;50:12;51:3,6,
21
**top (5)**
45:4;47:21;48:21;
57:24;58:20
**topics (2)**
8:11,21
**topographical (4)**
28:16;29:22;38:2;
56:8
**topography (3)**
37:17,20;39:13
**tour (2)**
26:6;34:21
**towards (1)**
38:24
**tract (1)**
33:23
**trees (5)**
40:16,18;45:4;50:15;
51:15
**triangles (1)**
31:13
**try (1)**
23:6
**trying (1)**
53:9
**Two (12)**
10:10,12;16:23;
20:19,19,21;21:10,23;
34:17;45:3,6,12
**type (1)**
20:12
**typically (1)**
37:8

---

**U**

---

**under (4)**
4:6;22:15;56:20;

60:20
**underneath (1)**
10:18
**understood (1)**
6:1
**undertook (4)**
62:19;67:21;68:21;
69:10
**Unin- (1)**
24:7
**unincorporated (2)**
24:6;53:6
**University (2)**
18:5;20:2
**up (5)**
13:18;29:25;32:16;
45:24;62:12
**updated (5)**
16:22;29:4;34:7,12,
15
**upon (2)**
9:7;68:25
**upright (1)**
47:1
**upward (1)**
31:9
**used (2)**
4:16,17
**using (1)**
38:12

---

**V**

---

**variable (1)**
49:6
**various (1)**
24:20
**vegetation (2)**
39:13;40:22
**velocity (1)**
48:13
**venture (1)**
51:5
**version (3)**
17:20,20,25
**versions (1)**
17:19
**versus (2)**
13:1;57:9
**vertical (1)**
37:14
**via (1)**
19:4
**visit (4)**
13:19;39:10,16;45:2
**visited (1)**
12:13
**volume (7)**
56:13,18;57:5,6;
58:14,15,16

---

**W**

---

waiting (1)
28:11;29:2
**waived (2)**
4:10,12
**walked (1)**
26:13
**walk-through (1)**
35:18
**wall (1)**
21:7
**walls (1)**
47:21
**water (34)**
11:22;12:1,2;20:9;
21:6,8,11,12,19,22;
22:8,19;23:16;24:10;
25:3,20;38:8,17;41:1;
45:20;47:20;48:4,13,
20,22;56:13;57:1,10,
16,22;58:1,14,16;60:7
**waters (1)**
57:10
**way (5)**
6:13;9:9;11:21;
61:20;68:17;71:10,11
**week (2)**
21:2;27:15
**weeks (1)**
17:7
**West (2)**
21:13;31:13
**western (2)**
63:22;64:6
**wetland (1)**
63:8
**wetlands (4)**
42:24;43:3,5,12
**what's (13)**
10:14;23:3;24:23;
29:6,17;44:15;48:12;
49:14;50:23;57:25;
60:5,6;62:24
**whatsoever (1)**
60:18
**Whereupon (6)**
18:15;43:13;52:3;
53:22;66:22;72:6
**white (1)**
51:4
**whole (3)**
40:15,18;66:3
**whose (1)**
65:23
**width (1)**
56:11
**Williams' (1)**
27:10
**within (2)**
21:23;27:14
**without (4)**
27:2;40:6,21;54:7
**witness (28)**
4:5,22;5:18;6:17;8:7,

22;9:11;17:5,17;18:11;
29:12;32:8;35:14;37:4;
47:15;48:10;49:9;50:7;
52:18;55:8,24;62:16,
23;63:14;65:10;69:18,
24;72:7
**witnesses (1)**
35:13
**wondering (1)**
33:5
**words (1)**
11:25
**work (25)**
9:2,9,20,22;14:12,18,
20,23;19:17;20:13;
22:11,12;36:1;41:23;
55:2;63:2,24;64:21,22;
65:13,22;67:22;68:3,8,
21
**worked (8)**
9:14;14:13,16;15:15,
24;16:1,10,14
**working (1)**
15:23
**written (1)**
69:1
**wrong (1)**
38:12
**wrote (3)**
24:14;61:19;71:12

**Y**

**year (1)**
13:9
**years (3)**
15:20;16:2;21:24

**Z**

**zone (16)**
22:20,22;52:8,13,24,
25;53:19;54:16,20,20,
25;55:18;60:16;64:23;
70:20,21

**0**

**006000 (1)**
46:15
**006008 (1)**
46:13
**006016 (1)**
49:16
**03 (1)**
16:13

**1**

**1 (6)**
57:23;58:3,4,6,9,11
**1.4 (1)**
43:25

**12:46 (1)**
72:7
**12-1 (1)**
63:21
**12-29-2014 (1)**
34:14
**14 (1)**
26:15
**16th (1)**
62:3

**2**

**2 (3)**
33:23;48:1,3
**2007 (3)**
15:25,25;16:11
**2010 (1)**
14:24
**2011 (2)**
15:25;39:25
**2014 (2)**
15:25;16:16
**2016 (1)**
13:20
**20th (1)**
62:2
**25-acre (1)**
63:19

**3**

**30b6 (1)**
8:16
**3-10-2015 (1)**
34:7
**36-acre (1)**
63:19

**5**

**5 (1)**
59:20
**50-foot (1)**
32:19
**5th (2)**
62:2,4

**8**

**80-year-old (1)**
21:6

**9**

**9th (1)**
10:19